**ANCHOR SAVINGS BANK, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–39 C.**

United States Court of Federal Claims.

Sept. 29, 2003.

Edwin L. Fountain, Jones, Day, Reavis & Pogue, Washington, DC, attorney of record for plaintiff, with whom were George T. Manning, C. Thomas Long, Joseph J. Migas, and Debra L. Satinoff.

Patrick T. Murphy and Tarek Sawi, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washing-

ton, DC, with whom were Colleen Hanrahan, and Brian J. Mizoguchi.

## Opinion and Order

BLOCK, Judge.

This is a *"Winstar"* breach of contract case. It is an example of the many cases heard by this court which stem from the savings and loan crisis of the early 1980's, Congress' subsequent attempt to quell the crisis through passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 ("FIRREA"), and the United States Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), which held that passage of FIRREA breached various existing contracts between certain Savings and Loan Thrift institutions and their federal regulators.

Anchor Savings Bank, FSB ("Anchor") was one of a number of thrift institutions which acquired failing thrifts during the 1980's under the supervision of federal regulators. This court has already both established the existence of regulatory forbearance agreements between federal regulators and Anchor, and that the passage and implementation of FIRREA constituted the *sine qua non* of the breach of those agreements. *Anchor Savings Bank, FSB v. United States*, 52 Fed.Cl. 406 (2002). Consequently, the only question remaining ought to be, and is, the type and *quantum* of damages to which the plaintiff is entitled. The money here is big (plaintiff claims nearly $1 billion in lost profits), the advocates for the parties are good, and the pleadings even before trial are voluminous.

Before the court is defendant's motion for summary judgment under Rules of the Court of Federal Claims ("RCFC") Rule 56. In a sense, a singular theme pervades the parties' submissions. This theme is akin to Dickens' *A Tale of Two Cities*. To defendant, Anchor is entitled to *no* damages because any monetary loss plaintiff alleges to have suffered was caused solely by its own mismanagement and cannot be traced to any breach of contract. Defendant views the events of this case through the dark lenses of it being the "the worst of times" for Anchor in the 1980's and that passage of FIRREA played no effective role in Anchor's alleged subsequent financial woes. Defendant contends that plaintiff has presented no facts to dispel its version of the facts and plaintiff's theories of damages are thus fanciful at best.

Plaintiff, to the contrary, contends that whether or not Anchor made bad business decisions or was a victim of a bad economy marked by high interest rates is immaterial because its losses are, and can be proven at trial to be, engendered singularly by the breach of contract, the passage and implementation of FIRREA. Indeed, the facts at trial will illustrate, plaintiff maintains, that after its agreements with the federal regulators and its business reorganization, which included its entry into various new markets and diversification into profitable new avenues of growth, things went swimmingly well, and it was only when those agreements were breached that it had to divest itself of certain highly profitable subsidiaries and take other actions to raise the necessary capital to stay in regulatory compliance. Thus, to plaintiff, but for the breaches, it was headed for "the best of times."

Be that as it may, exactly whose portrait of events is true is quintessentially an issue resolvable only at trial. What plaintiff must do to survive defendant's Rule 56 assault is to proffer enough probative evidence sufficient to engender a controversy over material issues. At this stage of the proceeding, plaintiff does not have to prove its case. It appears to the court, as will be explained below, that plaintiff has, with certain key exceptions, accomplished its task under the rule.

Conversely, for defendant to fully prevail under Rule 56, it must establish that plaintiff has failed to make a *prima facie* case for damages *as a matter of law*. In other words, Rule 56 places a heavy burden on defendant as the movant, not to establish that plaintiff's view of the world was simply one of too rosy a scenario and that, therefore, the *quantum* of damages is nominal at best (indeed, the amount of damages is the ultimate issue to be proven at a trial), but instead to substanti-

ate that plaintiff has simply not proffered *any* set of material facts demonstrating that its view of events is reasonably probable. This is a hefty weight to lift.

For the reasons fully stated below, the court finds that defendant has, particularly with regard to plaintiff's lost profit claims, failed to meet its burden. As a result, defendant's motion for summary judgment is denied-in-part and granted-in-part.

## I. Background

The full facts of this case were previously discussed in this court's April 30, 2002 opinion. *Anchor Savings Bank, FSB v. United States*, 52 Fed.Cl. 406, 407–411 (2002). Familiarity with both that opinion and the Supreme Court's Opinion in *Winstar* is presumed. The facts below, however, not only give helpful background information, but are particularly relevant to the defendant's current summary judgment motion.

During the early part of the savings and loan crisis of the 1980's, plaintiff Anchor Savings Bank sought to purchase the following federally-chartered savings and loan associations: (1) Suburban Federal Savings and Loan Association ("Suburban"), (2) First Federal Savings and Loan Association of Crisp County, Georgia ("Crisp"), (3) Peachtree Federal Savings and Loan Association ("Peachtree"), (4) Standard Federal Savings & Loan Association ("Standard"), (5) Heritage Federal Savings and Loan Association ("Heritage"), (6) Tri–City Federal Savings and Loan Association ("Tri–City"), (7) Sun Federal Savings and Loan Association ("Sun"), and (8) United Federal Savings and Loan Association ("United"). All eight of the above savings and loan (S & L) associations had considerable debt at the time Anchor purchased them.

Pursuant to then-existing federal law, S & L's had to "reserve" a certain amount of capital per annum (the so-called "capital reserve requirement") in order to meet the regulatory standards imposed by the Federal Home Loan Banking Board ("FHLBB" or "Bank Board") and the Federal Savings and Loan Insurance Corporation ("FSLIC"). Although Anchor could itself meet the capital reserve requirements, it could not do so after assuming the debt of the eight ailing S & L's

it purchased. The FHLBB and the FSLIC, however, sought to facilitate Anchor's purchases in hopes that doing so would, in the long run, slow or even reverse the then-current trend of S & L's declaring bankruptcy. Depending on the severity of the ailing S & L's debt, the FHLBB and FSLIC used various financial, regulatory and accounting tools which allowed Anchor to purchase the ailing S & L's while still passing regulatory muster.

In some cases, Anchor had sufficient capital to purchase an ailing S & L with little or no assistance from the government. In these instances, termed "unassisted transactions," Anchor simply sought the FHLBB's and FSLIC's approval of its purchases, and after receiving the approval, went ahead with the transaction. The unassisted transactions included the acquisition of Standard, Tri–City, Heritage, and United.

In other cases, however, the debt of the ailing S & L was so great that the FHLBB and FSLIC assisted the transaction by using any combination of the following tools: (1) forbearing from applying the capital requirements to Anchor for a certain number of years after the purchase, (2) giving Anchor an outright cash infusion, (3) loaning Anchor the needed funds (termed a "capital credit"), or (4) deeming the debt to be "goodwill" under the "purchase method" of accounting, and then amortizing that amount over a given number of years. The transactions in which some or all of these tools were used are termed "assisted transactions," and included the acquisitions of Peachtree, Crisp, Sun, and Suburban.

In 1989 Congress passed and the President signed FIRREA, which fundamentally affected both the assisted and unassisted transactions. In essence, FIRREA prevented S & L's from counting intangible assets as capital for regulatory purposes. This meant that the capital credits and goodwill were no longer considered capital under FIRREA. As a result, Anchor allegedly lost most of its core capital, could not comply with applicable regulations, and suffered significant financial losses for which it seeks recovery against the government in this court.

The rulings from this court came piecemeal, dealing first with certain acquisitions and then certain intangible assets. The first ruling came on April 30, 2002, when this court granted summary judgment against the government for breach of contract in the Peachtree and Crisp assisted transactions. The April 30th decision also found no liability for breach of contract in the unassisted acquisition of Standard. The specifics of the Peachtree and Crisp transactions are detailed below, followed by the particulars of the Standard transaction. A second ruling was made on August 19, 2002, whereby this court found that an agreement by FSLIC to grant additional credit to Anchor in its acquisition of Suburban did not supersede the Master Agreement and, therefore, was part of the breach caused by the passage of FIRREA. The final liability ruling was issued by the court on August 26, 2002. It pertained to the issue of whether a cash infusion in the Suburban contract fell under FIRREA. This was answered in the negative. Both August, 2002 rulings will also be discussed more fully below.

## A. *Peachtree & Crisp*

On June 25, 1982, Donald Thomas, Chairman and CEO of Anchor, sent a letter to the FHLBB describing Anchor's proposal to acquire by merger Peachtree and Crisp. The letter expressly noted that Anchor would utilize the "purchase method" of accounting in structuring its merger proposal which meant, *inter alia*, that Peachtree's and Crisp's debt would be considered goodwill by the government and amortized over a 40–year period. Although the proposal was amended several times before being approved, the Bank Board ultimately approved Anchor's acquisition of Peachtree and Crisp.

Shortly thereafter, on December 20, 1982, the FHLBB issued a "forbearance letter" to Anchor which stated that "the Bank Board will forbear, for a period of five years following the Effective Dates, from exercising its authority under section 563.13(c) of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation because of Anchor's failure to comply with the statutory reserve and net worth requirements of Section 563.13 ...." Of particular importance to this court, however, is the clause in the forbearance letter which stated:

Provided that Anchor submits analyses, accompanied by a concurring opinion from its independent accountants, satisfactory to the [FHLBB or its agents] ... that (a) describes specifically ... any intangible assets (including goodwill) ... arising from the mergers to be recorded on Anchor's books, (b) substantiate the reasonableness of amounts attributed to intangible assets ... and related amortization methods and periods, and (c) conclude that Anchor has accounted for the mergers in accordance with generally accepted accounting principles ("GAAP"), as GAAP existed as of the [merger], Anchor's use of the purchase method of accounting shall be considered to be in accordance with GAAP and with regulatory accounting procedures.

*Anchor Savings Bank, FSB,* 52 Fed.Cl. at 411.

Citing *Winstar,* this court found that the letters and agreements cited above created a contract between Anchor and the government whereby the government agreed to Anchor's amortization of the goodwill incurred in the Peachtree and Crisp transactions, and to forbear from applying otherwise preventive regulations. This court concluded that this contract was breached by the passage of FIRREA, and therefore granted plaintiff's motion for summary judgment as to the Peachtree and Crisp transactions. *Id.* at 420–421.

## B. *Standard*

This court's April 30th ruling also adjudicated the unassisted acquisition of Standard. On January 24, 1983, Anchor and Standard entered into a merger agreement which was conditioned on the approval of the Bank Board, and on an independent auditor's opinion regarding the "use of purchase accounting with respect to the assets and liabilities of the Merging Association..." Assuming these conditions were satisfied, the FHLBB Supervisory Agent recommended that the merger of Standard into Anchor be approved without FSLIC assistance and using the purchase method of accounting. On March 16,

1983, the FHLBB accepted the Supervisory Agent's recommendation and approved the merger. *Id.* at 417.

In finding that a contract did not exist between Anchor and the government, this court cited the Federal Circuit's holding in *California Federal Bank v. United States,* 245 F.3d 1342 (Fed.Cir.2001), and noted that "the absence of an assistance agreement is not the critical factor in determining the existence of a contract, *vel non.* Rather, courts must determine whether there was mutual intent to contract including an offer and acceptance and consideration." *Anchor Savings Bank, FSB,* 52 Fed.Cl. at 420 (internal quotations omitted) (citing *California Fed. Bank,* 245 F.3d at 1347–1348). Considering, however, that the Standard transaction lacked a forbearance agreement and an assistance agreement, this court held that there were no "express or implied contractual assurances by the government for the long-term amortization of goodwill." *Id.* Summary judgment was therefore granted in favor of the government. *Id.* at 421.

After granting partial summary judgment as to Peachtree, Crisp and Standard, this court asked that the parties file briefs outlining the remaining issues in the case. In light of the April 30th ruling, Anchor conceded in its brief that the remaining unassisted transactions before the court—Tri-city, Heritage, and United—could not be distinguished from the Standard transaction. As a result, this court granted summary judgment in favor of the government as to those transactions, leaving only the government's liability in connection with the Sun and Suburban transactions to be determined.

C. *Sun*

In the Sun transaction, both parties agreed that the assistance agreement to the merger constituted a contract between Anchor and the government. The argument, however, centered around whether there was a term in the contract which obligated the government to allow Anchor to continue to count goodwill as regulatory capital throughout the 35–year amortization period. The specific clause at issue read:

RESOLVED FURTHER, that in accounting for the Merger, Anchor shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC ...

This court read the clause to obligate the government to apply the then-existing regulations to Anchor, including the regulations which allowed Anchor to count goodwill as regulatory capital throughout the 35–year amortization period. July 25, 2002 Tr. at 48. When FIRREA was passed, this court held, it prevented the government from fulfilling its obligation regarding the goodwill capital, and therefore resulted in a breach of contract. As a result, summary judgment was entered for plaintiff as to the Sun transaction. Order Memorializing Hearing on Dispositive Motions Pertaining to Unresolved Assisted Transactions (Aug. 2, 2002); *see also* July 25, 2002 Tr. at 48.

D. *Suburban*

By far the most complex transaction that Anchor engaged in was the acquisition of Suburban. Suburban had an extremely poor asset structure and a measured negative worth of $1.746 billion. Because of the significant debt Suburban carried, the FHLBB and the FSLIC gave a substantial amount of financial assistance to Anchor in order to complete the merger. That assistance took three forms: (1) a $150 million Income Capital Credit ("ICC"), (2) a direct cash contribution from the FSLIC of $50.875 million, termed an "FSLIC Capital Credit" ("FCC"), and (3) amortization of goodwill over a 34–year period.

The ICC was essentially a $150–million loan from the FSLIC to Anchor, the terms of which were set forth in the "Master Agreement" signed by both parties in 1983. Under the Master Agreement, Anchor issued an ICC which was then purchased by the FSLIC for $150 million. Anchor was then obligated to make annual payments to the FSLIC until the note was paid off. In 1986, in preparation for Anchor's going public, the parties entered an "Exchange Agreement" which partially superceded the Master

Agreement and changed the form of the ICC. Under the Exchange Agreement, the ICC was exchanged for a "Permanent Income Capital Credit" ("PICC") which was then re-exchanged for 3.14 million shares of Anchor preferred stock. Anchor was then obligated to issue dividends on the preferred stock until the remaining loan amount was paid off.

During oral argument, the contested issue was whether the Exchange Agreement superseded the Master Agreement so as to shift the risk of regulatory change onto Anchor instead of the government. On August 19, 2002, this court found that the Exchange Agreement did not supersede the Master Agreement as to the terms of the ICC. Order Ruling on "ICC/PICC/Preferred–Stock" Issue Pertaining to the Suburban Transaction at 2. Under the Master Agreement, this court first found that it was clear the government agreed to apply certain favorable regulatory treatment to the Anchor/Suburban acquisition. Secondly, although the Exchange Agreement contained a clause stating that it "supersedes all prior agreements and understandings between the FSLIC and Anchor relating to such subject matter," the terms "subject matter" limited the scope of the Exchange Agreement to its terms. Since the terms of the Exchange Agreement failed to address the ICC, the court found that the Master Agreement still governed treatment of the ICC, and that the risk of regulatory change never shifted to the plaintiff. As a result, when FIRREA eliminated the ability of Anchor to count the ICC as capital, it constituted a breach of the Master Agreement for which defendant was liable. Such was also the case with respect to the amortized goodwill since the Exchange Agreement was also silent as to any regulatory change in counting goodwill as capital. *Id.*

Having disposed of the ICC and goodwill issues, this court made a separate ruling on the FCC on August 26, 2002. Order Ruling on "Capital–Credit/FCC" Issue Pertaining to the Suburban Transaction. This court held that the FCC was a simple cash contribution and therefore not a "intangible asset" under FIRREA. Since FIRREA only applied to intangible assets, the FCC was unaffected by

FIRREA and therefore no breach of contract occurred. *Id.* at 6.

The August 26th ruling concluded the liability stage of this litigation. The parties then shifted their focus to the *quantum* of damages Anchor suffered in connection with the Peachtree, Crisp, Sun and Suburban transactions.

## II. Plaintiff's Damages Theories

Although it is defendant's motion that is currently *sub judice*, this court's analysis begins with a description of plaintiff's damages theories in order to provide the information necessary for understanding defendant's arguments. Anchor has proffered three alternative damages theories: (1) expectancy damages, (2) restitutionary damages, and (3) reliance damages. Defendant seeks summary judgment only as to plaintiff's expectancy and reliance damages claims. Def.'s Mot. for Summ. J. at 1.

### A. *Anchor's Expectancy Damages Theory*

One of the ways the law compensates a non-breaching party is by giving that party the benefits they expected to receive had the breach not occurred. *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 344(a)(1981)). "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *California Fed. Bank, FSB,* 245 F.3d at 1349 (citing RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981)). Lost profits can constitute contract damages if their loss is "the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made." *Id.* (citing *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (Ct.Cl.1961)).

Plaintiff's expectancy claim has four components: (1) the sale of Residential Funding Corporation ("RFC"), (2) the sale of some of Anchor's branch banks in Georgia, New Jersey, and New York, (3) a "gross-up" of any damage award to cover Anchor's future tax

liability, and, alternatively, (4) a hypothetical stock offering.

### 1. *RFC*

In 1988, Anchor purchased RFC. Unlike a conventional mortgage provider, like a mortgage bank, RFC operated in the so-called "secondary mortgage market." Operators in the secondary mortgage market did not buy and sell mortgages themselves, but rather, bought and sold mortgage securities. Secondary market participants like RFC would purchase several conventional mortgages from multiple mortgage providers, bundle those mortgages, and then transform the bundle into a fungible security that could be bought and sold by investors. This practice was profitable due to arbitrage—companies like RFC would purchase mortgages in the conventional mortgage market at one price, and then sell the mortgage securities in the secondary mortgage market at a higher price. Because of this business practice, companies like RFC were known as "mortgage conduit" companies.

Anchor owned and operated RFC as a subsidiary until 1990 when RFC was sold for $64.4 million to General Motors Acceptance Corporation ("GMAC"), a wholly-owned subsidiary of General Motors Corporation. Anchor's claim with respect to RFC is that, but for FIRREA, Anchor would not have sold RFC in 1990, but instead, would have held-on to the company and reaped profits therefrom.[1] To measure the amount of profits Anchor lost, Anchor's model looks at the profits GMAC reaped from RFC and asserts that those profits represent a reasonable estimate of what RFC would have made had it remained under Anchor's stewardship. Baxter Rpt. at 42, ¶ 73, Ex. 10, 18.

Anchor further posits that, because RFC changed its structure and investment strategy under GMAC ownership in 1997, it could no longer be used as a proxy to measure Anchor's lost profits. Anchor then substitutes North American Mortgage Company ("NAMCO"), which Anchor purchased in 1997, in the place of RFC and asserts that NAMCO's profits should serve as the proxy for Anchor's damages from 1997 forward. Alternatively, Anchor asserts that if NAMCO is not seen by the court as a substitute for RFC, NAMCO should be considered mitigation of Anchor's damages since it would not have made strategic and financial sense to hold both RFC and NAMCO.[2]

The grand theorist behind these ideas is Dr. Nevins D. Baxter, whose qualifications as an expert stem from his position as a consultant to banks and thrifts throughout the United States. At one time, Dr. Baxter served as president and then-chairman of his consulting firm until it was eventually acquired by BEI holdings. He has written numerous articles in the area of banking regulation, and was the principle expert in two landmark cases in this Circuit, *LaSalle Talman Bank, FSB v. United States*, 45 Fed.Cl. 64 (1999), *aff'd in part, vacated in part*, 317 F.3d 1363 (Fed.Cir.2003) and *Glendale Federal Bank, FSB*, 43 Fed.Cl. 390 (1999), *aff'd in part, vacated in part*, 239 F.3d 1374 (Fed.Cir.2001).

Dr. Baxter is flanked by a fivesome of experts, each producing a separate expert report dealing with a discrete area of analysis. First, there is Eugene M. Katz whose qualification as an expert stems from his former position as a member of the litigation staff of the Office of the Comptroller of the Currency, and also from his position as Sen-

---

1. Expert Report of Nevins D. Baxter, Pl.'s Mot. in Opp'n to Def.'s Mot. for Summ. J., App. at 42, ¶ 73, Ex. 10, 18. References to expert reports made hereinafter in this opinion will be short-cited according to the following example: "Baxter Rpt. at 42, ¶ 73, Ex. 10, 18."

2. It is unclear what Anchor's position on NAMCO actually is. On the one hand, Anchor's own expert, Nevins Baxter, clearly views NAMCO as mitigation for RFC's damages. Baxter Rpt. at 24, ¶ 63 ("It is my opinion that the acquisition of NAMCO is properly viewed as mitigation of the

damages resulting from the forced sale of RFC."). On the other hand, at oral argument Anchor's counsel views NAMCO as an alternative measure of damages after 1997. August 20, 2003, Oral Argument on Damages, Tr. at 124 ("THE COURT: I'm trying to pin you down. Is it Anchor's position that [NAMCO is] not mitigation? COUNSEL FOR PLAINTIFF: Yes. We don't have to make it mitigation."). The issue of whether NAMCO is mitigation or not is discussed and resolved below, but for now, the court will view Anchor as asserting alternative theories.

ior Deputy General Counsel and Director of the Office of General Counsel for the FHLBB. Katz' report stands for the proposition that Anchor could have done two things in order to retain ownership of RFC and still complied with all applicable rules and regulations. Anchor could have attracted outside investment to fund RFC, or it could have consolidated RFC into Anchor itself.[3] Katz Rpt. at 5. Katz then analyzes the feasibility of both of these options and concludes that Anchor and RFC could have remained in regulatory compliance under either alternative. *Id.* at 7–10.

Anchor's second expert report was produced by Messrs. Daniel V. Dooley and Thomas C. Kaylor. Mr. Dooley's qualification as a expert stems from his current position as partner in the accounting and consulting firm of PricewaterhouseCoopers, LLP ("PwC"). Dooley & Kaylor Rpt. at 4. He has extensive experience in the areas of auditing, consulting and forensic accounting in the banking and financial institutions industry. Mr. Kaylor specializes in business valuations and has particular expertise in the area of valuing financial institutions. Both men have written several articles in their respective fields, and Mr. Dooley has either testified or given deposition testimony in thirteen similar legal disputes. The Dooley and Kaylor report stands for the proposition that: (1) Anchor could have retained RFC and operated in compliance with applicable capital regulations, (2) Anchor could have funded RFC at a cost comparable to GMAC, and (3) Anchor's continued ownership of RFC would not have caused Anchor to exceed reasonable ratios of borrowed funds to total assets. Baxter Rpt. at 19–20, ¶ 50.

Anchor's third expert is Jess Lederman whose qualification as an expert stems from his former experience in helping to found the first two, private-mortgage conduit firms. Mr. Lederman also helped create Bear Sterns Mortgage Capital Corporation, and currently serves as Chairman of the Secondary Marketing and Capital Markets Committee of the Mortgage Bankers Association of America. Mr. Lederman's expert opinion is

that, absent FIRREA, Anchor could have retained RFC and operated it successfully in much the same manner RFC was operated under GMAC. Lederman Rpt. at 26, ¶ 69.

The fourth expert upon which Baxter relies for his conclusions regarding RFC is Mark Korell. Mr. Korell was the president and CEO of RFC in 1989 when it was owned by Anchor, and was later the CEO of the GMAC Mortgage Group from 1993 to 1995. Mr. Korell's deposition, Dr. Baxter asserts, stands for the proposition that the business plan implemented at GMAC was the same plan he developed in 1989 when Anchor was owned by RFC. Baxter Rpt. at 20, ¶ 50; *see also* Dep. of Mark Korell 29, 104–107, 161, 162, 207–211, 275–276, 290–292, 296, 299–300.

Finally, there is the expert report of Paul Allen Schott. Mr. Schott's qualification as an expert stems from his position as a principle at PwC, as well as from his former positions as Chief Counsel of the Office of the Comptroller of the Currency. He also gave testimony before Congress during the pendency of FIRREA, and provided advice to congressional committees and staff members concerning capital and other regulatory issues. Schott Rpt. at 4. Mr. Schott concludes that had Anchor been able to count its supervisory goodwill and other various assets as tangible capital, Anchor could have met the risk-based capital requirements in place between December 31, 1990 and December 31, 1996.

Through these experts, Anchor asserts that the forced sale of RFC was caused by FIRREA and resulted in Anchor losing $328.9 million in lost profits. To that number is added $351 million which reflects the purchase price of NAMCO. The final calculation is to subtract the sale price of RFC—$92.8 million—which brings Anchor's total lost profits in connection with RFC to $587.1 million.

*a. Reduced Stock Proceeds*

As a sub-component of Anchor's RFC lost profits claim, Anchor also claims the lost profits associated with a 1993 stock offering. Anchor alleges that, had it retained RFC, Anchor would have been a more valuable

---

**3.** Mr. Katz also posits in a footnote that Anchor could have converted into a holding company structure with RFC as a subsidiary of the holding company.

company, and could therefore have charged more per share of stock than it actually did in its 1993 offering. Again, Dr. Baxter's report is central, although he does rely on the Dooley & Kaylor report in reaching some of his conclusions. Dr. Baxter asserts that Anchor's ownership of RFC alone would have increased Anchor's value by approximately 30%, and, therefore, this would allow Anchor to demand $17 per share, rather than the $13 per share actually demanded in 1993. In total, the four-dollar difference between the but for share price and the actual share price adds up to a total of $49.3 million.

## 2. The Branch Sales

The second component of Anchor's lost profits claim is the branch sales. Anchor claims that, because of FIRREA, Anchor was forced to sell the deposits in certain bank branches in order to replace the value of the lost goodwill with tangible capital. When those sales took place, Anchor posits, the post-FIRREA market for thrift branches was so abysmal that Anchor received much less than fair-market value for the branch deposits it sold. As a result, Anchor claims it is entitled to recoup the difference between what Anchor actually received in selling the branches, and the value of the branches but for FIRREA.

To support this theory, plaintiff again cites the expert report of Dr. Baxter. Dr. Baxter's report begins by looking at all the branches Anchor sold between 1991 and 1998 in Georgia, New Jersey, Florida and New York. Baxter Rpt. at 21, ¶¶ 54, 55, Ex. 7. From this list of 70 branches, Anchor subtracts those branches for which sales were pending on or before July 1989 since Dr. Baxter believes these branches would have sold regardless of FIRREA. Anchor also subtracts all eighteen of the Florida branches since Dr. Baxter believes the Florida branch-

es were sold at fair market value. *Id.* Anchor then takes the total proceeds from the remaining branch sales—$1,413,287,000—and multiplies that number by 12%. *Id.* at Ex. 16,17. Twelve percent, Baxter believes, is the mark-up Anchor would have enjoyed had it sold the branches in the but-for-FIRREA market. Dr. Baxter arrived at the 12% number by looking at actual branch sales that took place in the relevant regions between 1997 and 1999, a period Dr. Baxter believes reflects a fair market. *Id.* at ¶¶ 69, 70. The total amount to which Dr. Baxter believes Anchor is entitled is calculated by taking $169.6 million (the yield of $1,413,287,000 multiplied by 12%)[4] and then subtracting from that amount the actual sales prices of the branches ($49.3 million). This results in $120.3 million being the total lost profits in connection with the branch sales.

## 3. The "Gross-up" Theory

On top of any lost profits award this court may or may not award, Anchor seeks an added kicker to cover the taxes on the award. This so-called "gross-up" theory is described in plaintiff's brief as follows:

> Dr. Baxter grossed up three elements of Anchor's expectancy claim that were computed on an "after tax" basis—(1) the NAMCO purchase price, (2) offset by proceeds of the sale of RFC, plus (3) the reduced proceeds from Anchor's stock sale. Because Anchor would be taxed on any award of these items, Anchor will not be made whole unless the award is grossed up to reflect their "pre-tax" value.

Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 56.

The expert behind the gross-up theory is Robert H. Miles, a comptroller for Washington Mutual Bank, Inc. ("Washington Mutual").[5] His qualification as an expert stems

---

4. The yield of $1,413,287,000 multiplied by 12% is $169,594,440. Dr. Baxter rounds the number up to $169.6 million.

5. In 1995, Anchor merged with Dime Bancorp, Inc. of New York to form Dime Savings of New York, FSB. Press Release, Dime Bancorp, Inc., Dime Bancorp and Anchor Bancorp complete Merger, (Jan. 13th, 1995) (reprinted in App. to Def.'s Mot. for Summ. J. at 517–519). On Janu-

ary 4, 2002, Dime Savings of New York, FSB was acquired by Seattle based Washington Mutual, Inc., the nations largest savings and loan institution. Washington Mutual, Inc., Form 10–Q for the quarterly period ended Sept. 30, 2002 at 5 (reprinted in App. to Def.'s Mot. for Summ. J. at 551–552).

from his knowledge of Washington Mutual's tax department, and his knowledge of corporate events that effect Washington Mutual's tax rate. He posits that, based on the business projections and planning documents he has reviewed, Washington Mutual will earn approximately $5 to 6 billion in 2003. Those earnings, Mr. Miles projects, will be taxed by the federal government at a 35% rate, and will be taxed at a state rate of 3% to 5%. Based on these facts, Mr. Miles opines that any award Anchor (now Washington Mutual) might receive, would be taxed at 38.38%. Miles Rpt. at 2, ¶ 3.

Dr. Baxter then takes Mr. Miles' computations, rounds the tax rate up to a clean 40%, multiplies it by Anchor's anticipated award, and arrives at a total "gross-up" of $220 million. Baxter Rpt. at 71, Ex. 18, Ln. 8.

### 4. *The Hypothetical Stock Offering*

The final component of plaintiff's expectancy damages claim is an alternative claim that plaintiff relies on only to the extent it cannot recover the lost profits from RFC, the branch sales, and the 1993 stock offering. The claim seeks the cost of replacing the goodwill capital erased by FIRREA. Or, in Dr. Baxter's words "the amount of cash the Government would have had to pay to enable Anchor to return to its pre-breach regulatory capital position, and thereby leverage that capital and earn profits thereon." Baxter Rpt., Supplemental Rpt., at 3, ¶ 6.[6]

The model upon which this claim is based begins by noting that supervisory goodwill is difficult to value because it is *sui generis* in two respects. First, although it can be leveraged, it is unlike cash because it is a non-earning asset—it cannot be invested for a return. Second, the supervisory goodwill in Anchor's contracts with the government amortized over time, thereby reducing regulatory capital each quarter. To account for the unique character of supervisory goodwill, Dr. Baxter uses an equally-unique method of valuing it. *Id.* at 4, ¶ 9.

The first step in the valuation method is to hypothesize that Anchor could have per-

formed a preferred-stock offering with the par value in the amount of the supervisory goodwill it would replace. The preferred stock, or "security," would then return to investors an income stream consisting of (1) a dividend payment equal to the interest rate on risk-free government securities, and (2) a series of principal payments mirroring the amortization schedule of the supervisory goodwill.

The first component of the income stream—the dividend payment—would reflect the non-earning characteristic of supervisory goodwill because the interest income that the thrift would earn on the risk-free government securities would be directly passed through to investors in the form of a dividend. The second component of the income stream—the principal payments— would reflect the amortization characteristic of the supervisory goodwill by returning principal to investors over a 35– or 40–year period, depending on the contract. *Id.* at 5, ¶ 10.

The key feature of this model is risk. Specifically, the difference between the risk of investing in Anchor, and the par value of the stock. In the real world, a reasonable investor would weigh the risks between investing in Anchor's securities, and simply investing in the government securities directly. Because the risk of investing in Anchor is higher than the risk of investing in the government securities themselves, a reasonable investor would pay less for Anchor's securities than for the government's.

The par value of Anchor's securities, however, is locked at the value of the supervisory goodwill and thus cannot decrease in price to reflect the risk differential. Therefore, the difference between the market value of Anchor's securities (the value reasonable investors would pay for Anchor's stock) and the par value of the stock (the amount of lost supervisory goodwill) equals the amount of Anchor's damages. *Id.* at 6, ¶ 13.

Anchor's damages in accordance with this model, plus transaction costs are computed

---

6. It should be noted that the model Dr. Baxter uses to make his estimations is based on that used by the FDIC's expert in *Glass v. United* *States,* 47 Fed.Cl. 316 (2000), *rev'd in part, vacated in part,* 258 F.3d 1349 (Fed.Cir.2001).

as of the date of the breach and total $200.965 million. *Id.* at 6, ¶ 12.

5. *Summary of Plaintiff's Expectancy Damages Claim* (numbers in millions)

| | |
|---|---|
| a. RFC pre-tax earnings, March 1990 to September 1997 | $328.9 |
| b. Purchase price of NAMCO | $351 |
| c. Less: sale price of RFC | ($92.8) |
| d. Replacement value of branches sold | $169.6 |
| e. Less: actual sales prices of branches | ($49.3) |
| f. Reduced proceeds from 1993 stock offering | $42 |
| g. 40% gross-up adjustment on lines b, c, and f | $220 |
| | Total: $969.4 [7] |
| | |
| h. Alternative damages: hypothetical stock offering | Total: $200.965 |

### B. *Anchor's Reliance Damages*

Another measure of damages the law recognizes to make a non-breaching party whole is to compensate that party for losses actually sustained as a result of the breach. *Glendale Federal Bank,* 239 F.3d at 1383 (citing RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981)). Through reimbursement of actual losses, the reliance remedy seeks to place the non-breaching party in as good a position as the party would have been in had the contract not been made. *Id.* Reliance damages are available for expenses of preparation, of part performance, as well as other foreseeable expenses incurred in reliance on the contract. *Id.* (citing CALAMARI & PERILLO, THE LAW OF CONTRACTS, § 14.9); *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 349(b) (1981).

As stated above, plaintiffs' claim for reliance damages is pled in the alternative to plaintiff's lost profits claim. Anchor's calculation of its reliance damages is complex and much contested by defendant. Although a description of these calculations will be given immediately below, the intricacies of plaintiff's reliance methodology will be delved into more deeply in section IV.B of the opinion.

Anchor's reliance damages are computed by Dr. Baxter through six mathematical/accounting steps, each of which are laid out in exhibit SS–5 in the appendix to this opinion. It is recommended that the reader follow along with the exhibit when reading the explanation below. In the first step (line 1),

Anchor adds up the cumulative cash loss from all the ailing S & L's it acquired as of December 31, 1989. Notably, this calculation was actually performed by defendant's expert, Mr. Barefoot W. Bankhead, and plaintiff simply adopts it as true and accurate. Mr. Bankhead computes the loss attributable to each of the acquired thrifts by taking all the debts and liabilities of the thrifts, and then subtracting six items: (1) discount accretions, (2) discount on loan sales, (3) premium amortization, (4) goodwill amortization, (5) servicing amortization, and (6) write-offs of servicing. The remainder, Anchor asserts, are the acquired thrifts' actual losses that Anchor assumed.

In the second step (line 2), Dr. Baxter subtracts 15% from the total, cumulative cash losses to reflect those acquisitions in which this court did not find the government liable. The 15% number is a rough average of two numbers: (1) as of December 31, 1989, 12.0% of Anchor's total supervisory goodwill was wrapped up in the non-contractual acquisitions, and (2) the non-contractual acquisitions represented 18% of the total deposits acquired from all eight of the supervisory acquisitions—Heritage, Standard, Tri–City, United, Peachtree, Crisp, Suburban and Sun. The net remainder, calculated in step three, is seen in line 3 is $217.121 million.

The fourth step (line 4) in Anchor's reliance calculation is to add the "deficit from contractual acquisitions before purchase ac-

---

7. Dr. Baxter's original report included $10.5 million in "wounded bank" damages (*e.g.*, transaction costs, printing fees, FDIC assessments, etc.) as part of its lost profits. These damages, however, fit more squarely under reliance damages and are therefore subtracted from the total lost profits, and are later accounted for in the section of the opinion dealing with reliance damages.

counting adjustments." Baxter Rpt., Ex. SS–5. To reach this amount, Dr. Baxter begins by taking the total pre-acquisition, negative net worth of Heritage, Standard, Tri–City, United, Peachtree, Crisp, Suburban and Sun. Importantly, this number ($267,502,000) is exactly the same as the amount of supervisory goodwill Anchor received from the government, and which was wiped out by FIR-REA. Dr. Baxter then subtracts from that number the negative net worth attributable to the non-contractual acquisitions—Heritage, Tri–City, United and Standard, Dr. Baxter also subtracts the $62.875 million in cash assistance the FSLIC gave Anchor to carry out the acquisitions.

In the fifth step (line 5), Dr. Baxter attempts to value the deposit base of Peachtree, Crisp, Suburban and Sun in order to determine what benefit Anchor received from the contract which must be given back to the government (the object of reliance damages is to return the parties to the status quo ante). To do this, Dr. Baxter multiplies each of the S & L's deposit bases by a premium of 1.5%, 3.0% or 2.5%. The premium amounts were determined by looking at the average premium received by Anchor on deposit sales in a given region: 1.5% was the average premium received in New Jersey; 3.0% was the average premium received in Georgia; and 2.5% was the average premium received in Florida. Accordingly, since Suburban was in New Jersey, its deposit base of approximately $2.3 billion is multiplied by 1.5% to yield total deposit value of $34.5 million. Likewise, since Peachtree and Crisp were in Georgia their combined deposit base of approximately $173 million is multiplied by 3% to yield a total deposit value of $5.2 million. Lastly, since Sun was in Florida, its deposit base of $637.4 million is multiplied by 2.5% to yield a total deposit value of $15.9 million. So, in total, Dr. Baxter estimates that the value of the deposits acquired by Anchor in all of the contractual acquisitions was approximately $55.6 million.

The sixth step (line 6) is similar to the fourth in that were Anchor to return to the status quo ante, it would have to sell its servicing portfolio. The proceeds from that sale would be a benefit to Anchor, and thus must be deducted from its other reliance damages. To understand this, however, one must understand what "servicing" is. Loan servicing involves the collection of payments from the borrowers, the maintenance of escrow accounts from which tax and insurance payments are distributed, reporting of tax information, and the foreclosure and sale of properties in the event of borrower default. Most often, loan servicing is performed by the institution that originated the loan, however, because loan servicing is actually a profitable undertaking in and of itself, the right to service another institution's loans is often contracted-out to a third party. The typical return for servicing an average loan is around 1% to 3% of the outstanding loan balance.

At the time of the breach, the servicing rights attributable to Anchor represented loans of $1.5 billion. Dr. Baxter estimated the market value of these remaining servicing rights at 2.5% or $37.5 million which represented the value of the future servicing profits. Thus, in order to place Anchor in as good a position as it would have been absent the breach, the $37.5 million in servicing profits Anchor would have made is credited to the government under Dr. Baxter's analysis.

## C. *Anchor's Wounded Bank Damages*

Anchor's wounded bank damages are in actuality a subset of its reliance damages. *See* Baxter Rpt., Second Supplement, Ex. SS–5. The moniker "wounded bank" is a term used to describe the actual costs incurred by the bank as a result of the breach. For example, Anchor claims the following as wounded bank damages: (1) $1.698 million in legal fees, (2) $2.360 million in investment banking and advisory fees, (3) $201,000 in accounting fees, (4) $109,000 in printing fees, (5) $4.657 million in excess FDIC assessments, (6) $2.322 million in management time. The total of these costs is $11.347 million. Baxter Rpt., First Supplement, Ex. 12R.

Although the components of Anchor's wounded bank fees are self-explanatory, one component warrants further description. Anchor's cost for "management time" is

based on the idea that Anchor's management—presumably its CEO, Board of Directors, etc.—spent an extraordinary amount of time dealing with the impact of FIRREA on Anchor and would not have done so if the government had not breached the contract by passing FIRREA. The theory is put forward in plaintiff's brief like this:

Anchor is entitled to the value of management salary expenses that were devoted to crafting and implementing Anchor's Capital Plan, *i.e.,* responding to the breach. Here the question is not whether Anchor would have incurred the expenses anyway, but whether it was deprived of the value of its senior managers' time that was diverted from building Anchor into a more profitable institution.

Pl.'s Brf. in Opp'n to Def.'s Mot. for Summ. J. at 97 (internal citations omitted). Anchor's entitlement to these costs, as well as its entitlement to the other wounded bank costs, will be addressed in Section IV of the opinion.

### III. Standard of Review

RCFC 56 provides the standard of review in this case. The rule, which is the functional equivalent of Rule 56 of the Federal Rules of Civil Procedure, was the subject of the Supreme Court's landmark decision in *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The controversy in *Celotex* arose when plaintiff, Catrett, filed a complaint in the United States District Court for the District of Columbia alleging that the plaintiff's husband was killed due to exposure to asbestos contained in a product produced by defendant Celotex Corporation. *Id.* at 319, 106 S.Ct. 2548. The action sounded in negligence, breach of warranty and strict liability. Celotex filed a motion for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure.[8] The district court granted the motion, explaining "there was no showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia

or elsewhere within the statutory period." *Id.* at 320, 106 S.Ct. 2548.

The D.C. Court of Appeals, however, reversed because Celotex " 'made no effort to adduce any evidence in the form of affidavits or otherwise, to support its motion.' " *Id.* (quoting *Catrett v. Johns–Manville Sales Corp.,* 756 F.2d 181, 184 (D.C.Cir.1985)). According to the D.C. Circuit, Rule 56(e) imposed an affirmative burden on the movant to prove *the absence* of any genuine issue of material fact, and only after that burden had been satisfied, was the non-movant required to respond by showing *the existence* of a genuine issue of material fact. *Catrett,* 756 F.2d at 184 (Bork, J., dissenting).

The Supreme Court reversed the D.C. Circuit, setting forth the burdens Rule 56 places on the parties, and how the parties shift those burdens between one another. The initial burden, the Supreme Court held, is on the movant, of course, and may be discharged "by 'showing'—that is pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. To make this initial showing, the moving party need not support the motion with additional evidence outside the record, but may instead rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.*

Once the initial showing is made by the movant, Rule 56(c) shifts its burden onto the non-moving party. At that point, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. This showing is critical under Rule 56(c) because unless it is made "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (quoting FED. R. CIV. P. 56(c)). It logical-

---

8. Federal Rule of Civil Procedure 56(c) and RCFC 56(c) both read in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, togeth-

er with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

ly follows, therefore, that absent such a showing "the moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*

Both the Supreme Court and the Federal Circuit have shed additional light on the standard announced in *Celotex.* An issue is "genuine," for example, only if it might prompt a reasonable jury to resolve a factual matter in favor of the non-moving party. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *See also Dart Advantage Warehousing, Inc. v. United States,* 52 Fed.Cl. 694, 697 (2002). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

*Celotex,* consequently, and its case-law progeny, establish two rules particularly important to the case *sub judice.* First, the moving party, in this case the government, can move for summary judgment by simply "pointing out" that there is a lack of evidence to buttress an essential element of Anchor's case. *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548 ("the burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). Secondly, in showing this, the defendant may rest solely on the pleadings, affidavits, interrogatories, *et cetera,* currently in the then-existing record. The movant neither needs to produce affidavits or other outside evidence in support of its motion, nor affirmatively prove the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548 ("But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits

or other similar materials *negating* the opponent's claim.") (emphasis original).

Thus, because the government, as explained below, has in essence taken this line of attack in its Rule 56 motion by merely pointing out that there is an absence of evidence to support essential elements of Anchor's case, the burden has now shifted onto Anchor. Anchor now must draw its sword and rebut defendant's allegations by proffering evidence sufficient to create a genuine issue of material fact. If Anchor presents such evidence, and thus parries its adversary's blows, it will live to battle again at the trial stage of this case.

## IV. Discussion

### A. *Anchor's Expectancy Damages*

As stated above, one of the ways the law compensates a non-breaching party is by giving that party the benefits they expected to receive had the breach not occurred. *California Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1349 (Fed.Cir.2001); *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a) (1981)). "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *California Fed. Bank, FSB,* 245 F.3d at 1349 (citing Restatement (Second) of Contracts § 347 (1981)).

The standard of proof for lost profits was enunciated by the Federal Circuit in *Wells Fargo Bank, NA v. United States,* 88 F.3d 1012, 1023–1024 (Fed.Cir.1996), *California Federal Bank, FSB v. United States,* 245 F.3d 1342, 1350 (Fed.Cir.2001) (*"Cal Fed"*) and *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1315 (Fed.Cir.2002).

For instance, in *Wells Fargo* the court opined that lost profits may be recovered if:

... the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized

by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit. *Wells Fargo Bank, NA*, 88 F.3d at 1023–1024. This standard creates a two-part, correlative test whereby each part is the obverse of the other. In the first part of the test, the court is asked to determine whether the lost profits claimed by the plaintiff would have "accrued and grown out of the contract itself, as the direct and immediate result of its fulfillment..." *Id.* On the other hand, the second part of the test asks the court to determine whether the lost profits claimed would have been realized by the party from undertakings "independent and collateral" to the contract. *Id.*

■ The test developed by *Wells Fargo* was later elaborated-upon by *Energy Capital*, which created a concomitant three-part test to determine whether the lost profits accrued and grew out of the contract itself. The test requires the plaintiff to show: (1) the lost profits were the proximate result of the breach; (2) the lost profits were caused by the breach were within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. *Energy Capital Corp.*, 302 F.3d at 1325 (citing *Chain Belt Co. v. United States*, 115 F.Supp. 701, 714, 127 Ct.Cl. 38, 58 (Ct.Cl.1953); RESTATEMENT (SECOND) OF CONTRACTS § 351(1) (1981) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."); *California Fed. Bank*, 245 F.3d at 1349 ("Lost profits are a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.") (internal quotations omitted); *Neely*

*v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961)).

Finally, and of particular import, the Federal Circuit in *Cal Fed* held "both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *California Federal Bank*, 245 F.3d at 1350.

The above standards and tests apply to all three components of Anchor's lost profits-damages claim: (1) lost profits in connection with RFC, (2) lost profits in connection with the branch sales, and (3) the "gross-up" theory. Each component is analyzed in turn below.

### 1. RFC

■ The government makes five arguments for why Anchor's damages in connection with RFC are either non-existent or impermissibly speculative. First, Anchor received fair market value for RFC upon its sale, and that value included RFC's potential for future profits. Second, Anchor's purchase of RFC, and the quantum of damages stemming from it, were unforeseeable. Third, RFC's damages were not caused by the breach. Fourth, NAMCO is not a reasonable substitute for RFC for mitigation purposes or otherwise. And fifth, Anchor incurred no damages as a result of the 1993 stock offering, and even if it had, those damages would have to be considered too speculative.

#### a. Whether Anchor Received Fair Market Value for RFC, and Whether That Value Included RFC's Future Earnings Potential

Defendant's first argument against plaintiff's claim for lost profits in connection with the sale of RFC is that Anchor did not lose any profits since, when it sold RFC, it received fair market value for it. Essential to this argument is the hypothesis that the potential for future profits of an entity are accounted-for and subsumed-in any sale price. Defendant cites several cases from other circuits including *Protectors Insurance Service v. United States Fidelity Guaranty Company*, 132 F.3d 612, 618 (10th Cir.1998) ("plaintiff has been made whole by receiving fair market value for the business") and *Gus-*

tafson v. General Motors Acceptance Corporation, 470 F.2d 1057, 1061 (8th Cir.1973) ("both the buyer and seller are deemed to have considered the business' prospects for future earnings and incorporated such into their agreed on price").

Plaintiff argues in response that it did not receive fair market value for RFC because a fair market value sale must take place between a willing buyer and seller. Since Anchor was forced to sell RFC in order to comply with FIRREA's new capital requirements, it cannot be said Anchor willingly sold it. Anchor cites two cases allegedly supporting the idea that fair market value turns on the willingness of the buyer and seller, *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 538, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("fair market value presumes conditions that, by definition, simply do not obtain in the context of forced sale") and *Yancey v. United States*, 915 F.2d 1534, 1542 (Fed.Cir. 1991) (defining fair market value as "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell").

Plaintiff further argues that its case fits neatly under *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438 (1961), an opinion by this court's predecessor, the United States Court of Claims. In *Neely*, the plaintiff bid on and was awarded a lease to mine federal land for coal. After entering the lease, however, a government official informed plaintiff that strip-mining[9] would not be permitted on the land. Plaintiff objected, arguing that the restriction on strip mining was not part of the lease terms, and that the applicable regulations permitted strip mining if proper drainage was present. *See* 30 C.F.R. § 211.27 (1961). Despite these objections, the government still refused to permit plaintiff to strip mine the property, and as a result, plaintiff assigned the lease to a third party for $22,000.

The Court of Claims held that, despite the fact that plaintiff received $22,000 as consideration for the lease assignment, plaintiff was nevertheless entitled to prove lost profits because "plaintiff might have been able to secure a higher price for it, if the prohibition against strip-mining had not been imposed." *Neely*, 152 Ct.Cl. at 146, 285 F.2d 438. Plaintiff argues that *Neely* is instructive in this case, because it is alleged to stand for the proposition that, despite the fact that Anchor sold RFC, Anchor is still entitled to prove lost profits in connection with it.

Although *Neely* is good example of why plaintiff is entitled to show lost profits, the Federal Circuit's more recent holding in *Cal Fed* is an even better illustration of how the same principle applies in a *Winstar* case. In *Cal Fed*, the plaintiff-thrift entered into a contract with the government to acquire several ailing S & L's, and was promised the value of the supervisory goodwill as regulatory capital. FIRREA breached the contract, and plaintiff sued in much the same fashion Anchor has here. Cal Fed alleged that the government's breach forced it to sell $4 billion in single-family, adjustable rate mortgages. Cal Fed then provided "expert testimony, which traced the actual post-sale performance of these loans and arrived at lost profits of $317 million..." *California Federal Bank*, 245 F.3d at 1349–1350. In addition, Cal Fed provided documentation and deposition testimony that supported Cal Fed's claim that it was forced to sell a profitable business unit, California Thrift & Loan, to meet its capital requirements. *Id.* at 1350.

Notably, the Court of Federal Claims granted summary judgment against Cal Fed, ruling that, despite this evidence, Cal Fed would not be able to establish lost profits as a matter of law. The Federal Circuit reversed this ruling and held:

> Cal Fed submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits. The Court of Federal Claims erred by not permitting

---

**9.** Strip-mining is a form of mining in which the operator of a mine strips away the so-called overburden, i.e., the beds or strata of rock or earth that lie between the coal and the surface. The stripping is done with a machine, usually a dragline, which is operated in the open and which makes a pit that uncovers the coal. *Neely*, 152 Ct.Cl. at 151, 285 F.2d 438.

Cal Fed to present its evidence at a trial based on its legal conclusion that the proof would be too speculative.

*Id.*

In finding that Cal Fed produced evidence sufficient to show the existence of a genuine issue of material fact as to its lost profits, the Federal Circuit rejected the idea that summary judgment is the correct context for valuation debates. What Cal Fed establishes is that if a plaintiff identifies specific assets, alleges that those assets were sold as a result of the breach, and then proffers documentation and expert testimony tracing the post-sale performance of those assets, such showings are sufficient to create a genuine issue of material fact. Once these showings are made, Rule 56 is satisfied, and plaintiff is entitled to prove at trial the amount of its lost profits. Under Rule 56, whether or not plaintiff's lost profits were subsumed in RFC's sale price, or whether that price reflected fair market value is beside the point. Perhaps plaintiff did receive fair market value, and perhaps that value did include future earnings prospects; yet the context for making that determination is at trial—not summary judgment.

That said, as long as Anchor's claims are similar to those asserted in *Cal Fed,* and Anchor makes the necessary showings for such claims, Rule 56 is satisfied. Anchor clearly makes such claims, and provides more than adequate evidence to support them. Anchor alleges that it was forced to sell RFC in order to remain in capital compliance after FIRREA. And Anchor proffers evidence demonstrating the nexus between the government's breach of contract and Anchor's forced sale of its subsidiary. Baxter Rpt. at 19, ¶ 49 ("But for the breach, Anchor would have continued to own and operate RFC with the same strategic focus and the same management team that remained in place after the sale to [sic] GMAC."). Furthermore, Anchor has provided documentation, deposi-

tions and expert testimony which trace the lost profits and actual post-sale performance of RFC. *See* Baxter Rpt. Ex. 10 (tracing RFC's profits under GMAC's stewardship from 1990 to 1997); *see also* Lederman Rpt. at 26, ¶ 69 ("it is my opinion that if Anchor had not been breached, it would have retained ownership of RFC and operated it at least as successfully as RFC operated under GMAC's ownership"). As the Federal Circuit stated in *Cal Fed,* such evidence "more than suffice[s] to create a genuine issue of material fact as to the existence and quantum of lost profits."

*b. Whether the Purchase of RFC Was Fore-seeable, and Whether the Quantum of Damages Stemming from RFC Was Foreseeable*

Defendant's second argument falls victim to similar misunderstanding about the workings of Rule 56. Defendant argues that the damages allegedly incurred by Anchor from the sale of RFC were not foreseeable to the government because Anchor did not own RFC at the time the contracts were entered. Further, defendant argues that the *quantum* of damages incurred by RFC were not foreseeable because Anchor claims several hundred million dollars in damages, despite the fact that it bought RFC for $48 million and sold it for $64.4 million.[10] Having pointed out this evidence, the burden under Rule 56 then shifts onto the plaintiff.

To make the necessary showing, plaintiff makes two arguments. The first is that in the early 1980's, thrift regulators and Congress were encouraging thrifts to participate more actively in the secondary mortgage market. In light of this, Anchor alleges, it was foreseeable that thrifts like Anchor would delve into the secondary mortgage market and into companies like RFC. Plaintiff's best, although not its only, piece of evidence to support this assertion, is a statement made by Jay Janis who was the Chairman of the FHLBB in 1980. The statement is taken from Mr. Janis' testimony before the

---

10. Defendant also claims that because the damages arising from the sale of RFC were not foreseeable, the damages related to NAMCO and the 1993 stock sale were also not foreseeable. Defendant therefore claims that if summary judgment is granted on foreseeability grounds as to RFC, the concomitant damages attributable to

NAMCO and the stock offering must also be thrown out. As will be shown, however, the court refuses to grant summary judgment on the issue of whether RFC and its damages were foreseeable, and therefore need not entertain defendant's other arguments.

House Subcommittee on Financial Institutions Supervision, Regulation and Insurance. Relevant excerpts include:

The Bank Board has also taken steps to improve the ability of S & Ls to raise funds by various means and, in general, to strengthen the viability of S & Ls. For instance, we have authorized and encouraged the use of mortgage-backed bonds... and are presently contemplating increasing the overall ability of S & Ls to utilize outside borrowing, *i.e.*, borrowing other than through the Federal Home Loan Bank System.... Finally, the Bank Board has been encouraging the use of the private secondary mortgage market as a means by which S & Ls can originate mortgages and also improve their earnings position.

Statement of Jay Janis, FHLBB Chairman, *Hearings on H.R. 4986, H.R. 6198, and H.R. 6216: Before the House Subcomm. on Financial Institutions Supervision, Regulation, and Insurance of the Comm. on Banking, Finance and Urban Affairs*, 11, 22–23 (1980).

Anchor also has a more concrete example of the way Congress encouraged thrifts to expand into the secondary mortgage market. In October of 1982, Congress passed the Garn–St Germain Depository Institutions Act of 1982, Pub.L. 97–320, 96 Stat. 1469 ("Garn–St Germain"). Garn–St Germain authorized thrifts to engage in an expanded array of activities, and facilitated thrifts' expansion into the secondary mortgage market. *See* 12 U.S.C. §§ 3801–3805 (2002). Congress' intent, as Anchor argues, was clearly to push thrifts like Anchor into the secondary market, making it foreseeable that Anchor would acquire RFC.

Anchor also has a second argument to rebut the government's charge that Anchor's purchase of RFC was unforeseeable—Anchor's purchase of Suburban in 1983. Suburban had been a leading participant in the secondary mortgage market of the late 1970's, and its endeavors included selling and purchasing mortgage loans and mortgage-backed securities. Seeing as though Anchor had already broken into the secondary mortgage market with Suburban, Anchor argues

that further expansion into businesses like RFC was undoubtedly foreseeable-especially to the government who goaded Anchor into buying Suburban in the first place.

As for the *quantum* of damages, Anchor argues that it too was foreseeable since the relevant *quantum* is the amount of regulatory capital created by the contracts—in this case nearly $700 million ($500 million in goodwill from the four contractual acquisitions, the $50 million FCC, and the $150 million ICC). Given that the $700 million was to be leveraged for up to 40 years, Anchor argues, citing Dr. Baxter's expert report, that damages into the hundreds of million dollars were foreseeable.

Although both sides have somewhat cogent arguments as to foreseeability, the debate between the parties on this point is, again, one that should take place at trial. The applicable law on this question derives from the Restatement (Second) of Contracts § 351, and from Federal Circuit precedent. Section 351 of the Restatement, reads:

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

(a) in the ordinary course of events, or

(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981); *see also Landmark Land Co. v. United States*, 256 F.3d 1365, 1378 (Fed.Cir.2001); *Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544, 552 (2003).

But just as important as the precise standard to apply, the Federal Circuit in *Landmark* noted that "foreseeability is a question of fact." *Landmark*, 256 F.3d at 1369 (citing *Climatic Rainwear Co. v. United States*, 115 Ct.Cl. 520, 533, 88 F.Supp. 415 (Ct.Cl.1950)). Because the Federal Circuit has clearly stated that foreseeability is a question of fact, this court would be hard-pressed to summarily grant judgment on this issue. This is

true even though the government does raise an apparent contradiction in plaintiff's foreseeability argument—Anchor simply did not own RFC at the time the contracts at issue were consummated. But apparent contradictions are seldom fatal in fact. "Whenever I myself encounter a contradiction between doctrine and reason, I always give priority to reason." H.H. the XIVth Dalai Lama.

An instructive case is *Energy Capital Corp. v. United States,* 302 F.3d 1314 (Fed. Cir.2002). The plaintiff in *Energy Capital* was a financing corporation that entered a contract with the Department of Housing and Urban Development ("HUD"). The contract, called Affordable Housing Energy Loan Program ("AHELP"), eliminated regulatory barriers so that Energy Capital Corp. could extend loans to owners of HUD properties who sought to increase the energy efficiency of their homes. Before Energy Capital could extend the first loan under the AHELP program, the government breached the contract by canceling the program. Energy Capital Corp. sued for lost profits.

The government argued that AHELP was an entirely new venture, one not in existence at the time of contracting, and as a result, no evidence of AHELP's historical performance could be offered to establish a reasonable estimate of either the existence or *quantum* of plaintiff's lost profits. This point, the government argued, distinguished the case from both *Cal Fed* and *Neely,* and therefore entitled the government to summary judgment.

The Federal Circuit disagreed:

We do not agree that lost profits should be precluded as a matter of law for new ventures that have not previously been performed by a third party. Whether or not one considers AHELP to have been a "new venture" or merely an extension of Energy Capital's existing loan business, Energy Capital was required to demonstrate its entitlement to lost profits by showing the same elements that any business must show: (1) causation, (2) foreseeability, and (3) reasonable certainty. While the nature of a new venture may make it difficult to recover lost profits by establishing all of the elements of the gen-

eral rule, such damages are not barred as a matter of law.

*Energy Capital Corp.,* 302 F.3d at 1327 (citing *Chain Belt,* 115 F.Supp. at 714, 127 Ct.Cl. at 58; and ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 4.3 (5th ed.1998)).

*Energy Capital* establishes the proposition that, regardless of whether the business claimed as the source of plaintiff's lost profits was in existence at the time of contracting, the test is still (1) causation, (2) foreseeability, and (3) reasonable certainty. Thus, simply because RFC was not part of Anchor's portfolio at the time of contracting, does not deny Anchor, as a matter of law, the opportunity to show that RFC's purchase was foreseeable. *Landmark,* 256 F.3d at 1369 ("foreseeability is a question of fact"). The disconnect between the time of contracting, and the purchase of RFC may indeed make Anchor's burden on foreseeability a tough one; be that as it may, at this stage, Anchor's proffer of Garn–St Germain and Suburban is enough evidence that "a reasonable jury [could] resolve [the] factual matter in favor of the nonmoving party." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987).

This conclusion also applies, to the slightly different foreseeability argument asserted by defendant at oral argument. At oral argument, defendant contended that RFC was an independent and collateral undertaking under *Wells Fargo,* because mortgage conduit businesses like RFC did not exist at the time the contracts were entered. In counsel's words: "[Anchor is] not citing anything that says the government knew at the time we were contracting in '82, '83 and '85 that a breach of this contract would have an effect on an industry that doesn't even exist yet. Thrifts didn't do this sort of thing.... So this mortgage conduit industry didn't exist at the time of the contracts." August 20, 2003 Tr. at 16.

Defendant's argument on this point is based on a misunderstanding of the foreseeability inquiry in contract law. As the timeless treatise by Professor Corbin makes clear:

The existing rule requires only reason to foresee, not *actual foresight*. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.

11 CORBIN ON CONTRACTS § 1009 at 66 (Interim ed.) (emphasis added); *see also Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) ("expectation damages are recoverable provided they are actually *or reasonably* foreseeable...") (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 347, 351, 352 (1981)) (emphasis added).

Following the logic of defendant's argument, unless Anchor points to something indicating that the government specifically knew about entities like RFC operating in the then-nascent secondary mortgage market, the government could not possibly have foreseen the damages Anchor alleges. This, however, mistakes *actual foresight* with *reasonable foreseeability*. The law does not require parties to be either soothsayers or seers by reducing all eventualities in a contract.

To the contrary, Corbin and the applicable Federal Circuit case law, make clear that the damages alleged by the plaintiff must only "reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach." 11 CORBIN ON CONTRACTS § 1009 at 61, n. 1.5 (citing *Hadley v. Barendale,* 9 Exch. 341 (1854)). In undertaking this inquiry it is the contract itself that is the analytic starting point. *Wells Fargo,* 88 F.3d at 1022–1023 ("if the profits are such as would have accrued and grown *out of the contract itself,* as the direct and immediate result of its fulfillment, then they would for a

just and proper item of damages...") (emphasis added).

In the *Winstar* context, the subject matter or end of the contract was for the use of supervisory goodwill. *California Federal Bank, FSB,* 245 F.3d at 1349 ("the continued use of supervisory goodwill as regulatory capital ... was therefore a central focus of the contract"). Thus, under *Wells Fargo* and *Cal Fed* any lost profits accruing or growing out of the supervisory goodwill are recoverable as damages. *California Federal Bank, FSB,* 245 F.3d at 1349 ("profits on the use of the subject of the contract itself, here the supervisory goodwill as regulatory capital, are recoverable as damages.").

Ergo, the question here is whether a reasonable person simply could have foreseen the type of use Anchor made of its supervisory goodwill. Or, more specifically, could a reasonable person have foreseen that Anchor would use its supervisory goodwill to free-up other tangible capital for the purchase of RFC. As stated above, Anchor's evidence of Garn–St Germain, the statement by Mr. Janis, and the purchase of Suburban is sufficient to create a genuine issue of material fact as to whether the government should have reasonably foreseen the purchase of RFC and the damages resulting therefrom. Awarding summary judgment here is thus inappropriate.

Similarly, Anchor's evidence as to the *quantum* of damages stemming from RFC is also sufficient to defeat summary judgment. The Federal Circuit has repeatedly held that "if a reasonable probability of damages can be established, uncertainty as to amount will not preclude recovery." *California Federal Bank,* 245 F.3d at 1350. Anchor's proffer of Dr. Baxter's report, in conjunction with the reports of the Mr. Schott, Mr. Lederman, and Mr. Katz all establish a reasonable probability of damages stemming from RFC. Although the burden of proving the nearly $600 million in damages alleged by Anchor may be difficult, that wall must be hurdled at trial.[11]

11. The government argues in a different portion of its brief that summary judgment should be granted for the government on the issue of RFC's damages because Anchor cannot show that it could have run RFC like GMAC did. This argument really goes to whether Anchor can establish

its damages with reasonable certainty. Once again, Anchor bears its burden under Rule 56 by producing the expert report of Mr. Jess Lederman, the current Chairman of the Secondary Marketing and Capital Markets Committee of the Mortgage Bankers Association of America. Mr.

As a result, this court rejects defendant's argument that the government is entitled to summary judgment as to the *quantum* of damages Anchor alleges in connection with RFC.

### c. Whether the Government's Breach of Contract Caused RFC's Damages

The government has two arguments relating to causation. Its first goes like this: Anchor cannot show it would have retained RFC but for the breach because Anchor's ownership of RFC violated legal limits on investments in subsidiaries. The alleged proof of this is that Anchor would have had to sell RFC in order to comply with FIRREA's new risk-based capital requirements.

In order to describe the government's argument regarding the risk-based capital requirements, the court believes it is best to quote at length from the relevant portions of the government's brief.

> One of the greatest impacts upon Anchor's willingness to hold RFC was found in the risk-based capital regulations promulgated pursuant to FIRREA. 12 C.F.R. § 567. The risk-based capital standards required Anchor (or any thrift) to hold capital to support assets based upon the perceived credit risk of those assets. The risk-based capital rules required thrifts, for the first time, to hold capital against securities issued and sold but for which recourse of credit enhanced obligations were retained. These requirements were not breaching, although Anchor's goodwill could possibly have counted towards satisfying the requirements to some degree in a "but-for" world.... Even if recognition of Anchor's goodwill for regulatory capital purposes had not been phased out, it would have depleted over time though amortization and other adjustments, while Anchor's risk-based capital requirements would have grown if RFC grew. Indeed, even if one were to take it at face value, Anchor's "but for" model falls out of risk-based capital compliance in 1997. The sale of RFC

was entirely consistent with Anchor's contemporaneous appreciation of the impact of the risk-based capital requirements upon thrift institutions.

Def.'s Mot. for Summ. J. at 41–42 (citations omitted) (footnote omitted).

In addition to its confusing language, this argument seemingly cuts against what one would presume to be the government's position on causation—namely, that the breach of contract (no longer being able to count supervisory goodwill toward the capital requirement) in no way caused Anchor's damages. Defendant here acknowledges that the risk-based capital requirements were "*promulgated pursuant to FIRREA.*" It was this new, more onerous requirement that was alleged to have ultimately cause the sale of RFC. But the government admits that "*Anchor's goodwill could possibly have counted towards satisfying the requirements.*" The government thus basically concedes that causation here is a factual issue by confessing that the breach of contract "*could possibly have*" been at least a contributing factor in Anchor's sale of RFC. What factor and in what proportion exactly caused the sale of RFC, however, need not be sorted out for the purposes of this motion, because the issue of causation is a question of fact to be determined at trial. *See Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed.Cir.2001) ("causation is also a question of fact reviewed for clear error") (citing *Hendler v. United States*, 175 F.3d 1374, 1378 (Fed.Cir.1999)).

The government's second causation argument is that Anchor cannot show it would have retained RFC but for the breach because Anchor's ownership of RFC violated legal limits on investments in subsidiaries. Under then applicable Federal Regulations, federal associations like Anchor only had authority to invest in service subsidiaries like RFC to a maximum of 3% of total assets. These limitations were unrelated to FIR-

Lederman's report provides the evidence necessary under *Celotex* to establish a genuine issue of fact as to whether Anchor can establish its damages with reasonable certainty. Mr. Lederman's report states "based on all the considerations discussed in this report, it is my opinion that if

Anchor had not been breached, it could have retained ownership of RFC, *and operated it at least as successfully as RFC operated under GMAC's ownership.*" Lederman Rpt. at 26, ¶ 69 (emphasis added).

REA. By June of 1989, Anchor had exceeded this limitation by at least $312 million. Based on this, the government argues, Anchor would have been forced to sell RFC in order to be compliant with the limitations. The government has thus shifted Rule 56's burden onto plaintiff.

In response, plaintiff produces three pieces of evidence. The first is the expert report of Mr. Katz who opines that Anchor could have complied with the service subsidiary limitations by either finding outside investment for RFC, or by consolidating RFC into Anchor.[12] Secondly, Anchor cites the depositions of Anchor CEO, Mr. Large, who testified that "I knew that if we could not [fund RFC internally], that RFC could find funds elsewhere . . ." Large Dep. at 357–358. These first two pieces of evidence are offered to show that, but for the breach, Anchor would have retained RFC and would have found a way to comply with the service subsidiary limitations. Thirdly, plaintiff points to the deposition testimony of Anchor's deputy general counsel, Gene Brooks, who testified that although Anchor knew of its failure to comply with the service subsidiary limitations, FIRREA (with its phase out of supervisory goodwill) came down before Anchor had time to solve the problem. This statement is offered as evidence that Anchor would have dealt with the problems presented by the service subsidiary limitations in June of 1989, had FIRREA not interrupted two months later.

The crux of the parties' dispute is, of course, whether Anchor would have retained RFC but for the breach; or stated in the affirmative, whether the breach caused Anchor to sell RFC. The government argues that the service subsidiary limitations caused the sale, not FIRREA. The plaintiff rebuts that contention with Mr. Katz' report, and the depositions of Messrs. Large and Brooks—all of which tend to show that Anchor would have found a way to comply with the service subsidiary limitations had FIRREA not come crashing down. This dispute over causation simply boils down to whether it was the service subsidiary limitations or the breach that caused the sale of RFC. This is a quintessential question of fact, and summary judgment is clearly inappropriate when a court is faced with this kind of a question.

### d. Damages Associated with NAMCO

Defendant makes essentially three arguments with respect to NAMCO, only one of which is novel. The first is that since the purchase and sale of RFC was not connected to the breach, then neither can NAMCO be connected to the breach. As this court has previously found, however, RFC's nexus to the breach is a question of fact, and therefore, defendant's RFC-based argument on NAMCO cannot be decided on summary judgment.

The same is true for defendant's second argument which, playing off its earlier one, is an assertion that because Anchor received fair market value for RFC, and thus suffered no damages, the purchase of NAMCO could not, and did not, mitigate anything. This court, however, previously determined that the question of whether Anchor received fair market value for RFC, and whether that value accounted for RFC's future profits, is a question of fact that cannot be decided on summary judgment. It logically follows that the question of whether the purchase NAMCO constituted mitigation, can only be determined after RFC's lost profit damages, if any, are proven at trial. Thus, the government's argument, by virtue of its dependence

---

12. The government devotes nearly two pages of its brief to attacking Dr. Baxter's reliance on Mr. Katz to reach the conclusion that Anchor would have found a way to comply with the service subsidiary limitations. Mr. Katz' report, the government argues, sets forth only what Anchor *could have* done to meet the limitations. Dr. Baxter takes Mr. Katz' conclusions too far, the government continues, by concluding that Anchor *would have* undertaken one of the alternatives Mr. Katz explains in order to come into compliance with the limitations. The government, then, is really attacking the basis of Dr. Baxter's conclusion. Federal Rule of Evidence 703 controls these types of disputes and permits experts to rely on any type of fact or data "reasonably relied upon by experts in the particular field in forming opinions . . ." FED. R. EVID 703. If the government wishes to argue that experts in the field of banking and finance would not reasonably rely on a Mr. Katz' report in opining as to what Anchor would have done, they may do so by filing the proper motions. The motion *sub judice* under Rule 56, however, is not the proper means by which to achieve this end.

on the status of RFC, cannot be determined on this summary judgment motion.

Defendant's final argument regarding NAMCO goes more to the very heart of the doctrine of mitigation of damages. More specifically, the government argues that NAMCO cannot be considered a proper mitigative substitute for RFC because the two companies are, by nature, very different. Although NAMCO, like RFC, is a mortgage security provider, the government asserts it has different business approaches and different customers. This allegedly disqualifies NAMCO as a mitigative substitute.

It is now well-settled that damages are not recoverable to the extent that they could have been reasonably avoided. RESTATEMENT (SECOND) OF CONTRACTS § 350(1) (1981); *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1371 (Fed.Cir.2003). "Although it has been said that a plaintiff is ordinarily under a duty to mitigate damages, this is not strictly true, since there are no damages for breach of the duty; rather, the plaintiff simply cannot recover those damages that it could have avoided. Damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered either as not having been caused by the defendant's wrong or as not being chargeable against the defendant." RICHARD A. LORD, WILLISTON ON CONTRACTS § 64:27 (4th ed.2003). More importantly, for purposes of the motion *sub judice,* Williston instructs: "Thus, the principle of mitigation of damages has wide application and frequently involves a determination as to whether the plaintiff acted reasonably under the circumstances. What is a reasonable effort to avoid the injurious consequences of a breach is a question of fact." *Id.*

A closely-related doctrine, and one that provides guidance, is that of "cover" under the Uniform Commercial Code ("UCC").[13] The doctrine of cover applies were a seller breaches a contract for goods. In such a case, the buyer may "cover" or, in other words, obtain substitute goods from another seller. U.C.C. § 2–712 (1997); E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS, § 12.11 (2d ed.1998); *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir.2001). The substitute goods sought as cover need not be identical to those involved in the contract, but they must be "commercially usable as reasonable substitutes under the circumstances." U.C.C. § 2–712 cmt. 2. Whether cover provides a reasonable substitute under the circumstances is a question of fact. *Hughes Communications Galaxy, Inc.,* 271 F.3d at 1066 (citing *Bigelow–Sanford, Inc. v. Gunny Corp.,* 649 F.2d 1060, 1065 (5th Cir.1981)) (stating that whether cover is reasonable is a "classic jury issue").

Although the doctrines of mitigation and cover interrelate in this case since plaintiff, allegedly in an attempt to mitigate its damages, purchased NAMCO as a substitute for RFC, both doctrines make clear that NAMCO's role vis-a-vis RFC is a question of fact. Under the doctrine of mitigation, the question is whether the purchase of NAMCO was a reasonable attempt to mitigate the damages stemming from RFC. Looking then to the UCC's doctrine of cover for insight into whether a plaintiff's purchase of a substitute product is reasonable mitigation, the Federal Circuit has made clear such an inquiry is one for trial, rather than summary judgment. *Id.* Thus, the question of whether Anchor's purchase of NAMCO as a substitute for RFC was reasonable cannot be answered on summary judgment.

*e. Damages from the 1993 Stock Offering*

Defendant proffers two arguments as to why this court should reject plaintiff's argument that, had it retained RFC, Anchor would have been a more-valuable company, and thus would have earned more in its 1993 stock offering. The first is an economic concept termed the "zero net present value" theory. The theory asserts that a stock offering does not actually produce any money because the corporation issuing the stock

---

**13.** The court notes that the UCC does not apply here because the sale of goods is not at issue. The Federal Circuit, however, has deemed the UCC to be "useful guidance" in applying general contract principles. *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir.2001); *see also Fifth Third Bank,* 55 Fed.Cl. at 230.

must eventually pay dividends in an amount equal to the proceeds of the stock offering. In other words, the present value of the capital raised by the transaction is equal to the present value of the stream of dividends that the issuer is obligated to pay its stockholders. The theory is well recognized in corporate finance treatises, and has been asserted in other cases before this court. *See* Richard A. Brealy & Stewart Meyers, *Principles of Corporate Finance* at 16–29 (6th ed.2000); *see also LaSalle Talman Bank, FSB v. United States,* 45 Fed.Cl. 64, 104–105 (1999).

Plaintiff rebuts defendant's zero net present value theory by arguing that the theory was explicitly rejected by the Federal Circuit in *LaSalle Talman.* The court there held:

> The government argues that the $300 million had "no cost" because the "firm receives cash worth $300 million," which is "the full value of the promise it is selling." The Court of Federal Claims correctly rejected that argument, for capital is not costless to either the investor or the recipient... [T]he cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings.... All capital raised by a corporation has a cost, and it is well established that the payment of dividends is a capital cost.

*LaSalle Talman Bank, FSB,* 317 F.3d at 1374–1375 (citing *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Guaranty Nat'l Ins. Co. v. Gates,* 916 F.2d 508, 515 (9th Cir.1990); *City of Los Angeles v. United States Dep't of Transp.,* 165 F.3d 972, 979 (D.C.Cir.1999)).

We agree with the plaintiff. The Federal Circuit's rejection of the zero net present value theory is clear, and this court is bound thereby. Moreover, the lower court in *LaSalle* looked at the theory in depth and concluded:

The analysis is purely forward looking and value-oriented. It does not seek to measure the costs involved in a transaction, or to calculate the sum of the payments that an issuer would be obligated to pay investors under the proposed financing scheme. In other words, it has no value as a tool for calculating damages for breach of contract. *LaSalle Talman Bank, FSB,* 45 Fed.Cl. at 105. Again this court agrees. While a clever argument by defendant, the zero net present value theory is economically viable only in the "but for world" and only as a present "slice-in-time" corporate accounting idea. It is not a viable mechanism to calculate breach of contract damages because it does not take into account the aggregate cost (including any loss of market value of shares) of defendant's actions causing the stock offering in the first place and the monetary value of the forced transaction and opportunity costs, as well as the entirety of costs associated with the issuance of dividends and other payments to investors. Clearly then, this "purely forward looking" model "has no value as a tool for calculating damages for breach of contract." *Id.*

Thus, because defendant's zero net present value theory is rejected, the sole question remains whether Anchor's stock would have been more valuable had Anchor retained RFC. Answering this question, however, depends on the value of RFC, which, as this court previously stated, is a question of fact inappropriate for summary judgment. This conclusion is bolstered by recent decisions from this court which have refused to grant summary judgment on the issue of reduced value of stock proceeds. *See Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223, 246 (2003); *Citizens Federal Bank v. United States,* 52 Fed.Cl. 561 (2002).[14]

## 2. Lost Profits from the Branch Sales

 The second component of Anchor's expectancy damages claim is the lost profits

---

14. Defendant additionally argues that it is "highly speculative that Anchor's purported 'but for' stock offering would have occurred in the amount and time alleged." Def.'s Mot. for Summ. J. at 49. This argument goes to either the existence or amount of Anchor's damages, which is a question of fact. *California Federal Bank,* 245 F.3d at 1350 ("Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment...").

allegedly suffered in connection with various branch sales. Seeking summary judgment on this claim, defendant makes four arguments: (1) Anchor suffered no economic harm from the branch sales because it received fair market value for them, (2) Dr. Baxter's methodology in calculating the damages attributable to the branches is flawed as a matter of law, (3) Anchor cannot show FIRREA caused it to sell the branches, and (4) Anchor either failed to mitigate or fully mitigated the damages stemming from the branch sales.

*a. Defendant's Fair Market Value Argument*

Anchor's argument concerning the fair market value of the branches is a simple one: the government asserts that Anchor simply received fair market value for the branches when it sold them, and therefore has not incurred damages therefrom. To support this argument, the government cites Anchor's annual reports for 1990 and 1991 which state that the prices received for the branches sold in Georgia were "reasonable," and that "branches will be sold only if acceptable prices can be obtained." Def.'s Mot. for Summ. J. at 51 (citing Anchor Annual Report 1990 at 6; Anchor Annual Report 1991 at 21). Once again, such statements set the wheels of Rule 56 in motion and shift the burden on plaintiff to show that there is sufficient evidence of Anchor's harm to create a genuine issue of material fact.

To bear its burden, plaintiff cites the very same annual reports cited by defendant, as well as deposition testimony from members of Anchor's management. Excerpts of the 1990 annual report give context to the statements quoted by defendant. One segment of the report reads:

Unfortunately, [the branch sales] have not gone particularly well. A year ago a branch could be sold for a premium equal to 4% to 6% of its deposits. Since then, the Resolution Trust Company ("RTC") has been selling failed savings associations and their branches for premiums as low as 1/2%. This has driven the prices down, particularly in the New York and New Jersey areas where a large number of

branches may be coming on the market. Institutions are simply not going to buy from Anchor when all they need do is wait for an RTC auction. As a result, we have been having difficulty finding buyers at prices acceptable to Anchor.

Anchor Annual Report 1990 at 36.

Anchor's 1991 Annual Report contains similar evidence of a depressed market for thrift branches:

[T]he market for branches has, however, been adversely affected by the activities of the [RTC] in selling failed savings associations and their branches. Because the market for branch sales is eroding, no assurance can be given as to the success of [efforts to sell branches]. Such branches will be sold only if acceptable prices can be attained.

Anchor Annual Report 1991 at 21.

Further evidence of the poor market for thrift branches comes from the statement of Cody Sickle, the head of Anchor's branch networks: "it wasn't a matter of would we be satisfied with the price. Only a fool would think the prices that were available by this time were okay. These prices were absolutely disgraceful from a seller's standpoint, absolutely disgraceful. We had no choice." Dep. of Cody Sickle at 365. When asked directly by counsel "did you get fair market value?" Mr. Sickle replied "we didn't get fair market value." *Id.*

At base, the debate between plaintiff and defendant here boils down to a he-said-she-said situation. Defendant argues Anchor received fair market value, and plaintiff says it did not. Rule 56 is not designed to solve such disputes-trial is. Thus, it is no surprise that the evidence produced by plaintiff as to fair market value clearly satisfies Rule 56 and *Celotex.* Accordingly, whether or not Anchor received fair market value for the branches is a question of fact, and will be decided at trial.

*b. Defendant's Argument on Dr. Baxter's Methodology for Estimating the Value of the Sold Branches*

To refresh the reader, Dr. Baxter's methodology in estimating what Anchor believes to be the true fair market value of the sold

branches requires multiplying the actual sales price of the branches sold by a 12% premium. The 12% premium, according to Dr. Baxter, is the mark-up Anchor would have enjoyed had it sold the branches in the but-for-FIRREA market. Dr. Baxter arrived at the 12% number by looking at actual branch sales that took place in the relevant regions between 1997 and 1999, a period Dr. Baxter believes reflects a fair market.

Defendant argues this methodology is baseless because the branches sold between 1997 and 1999 (the sample group) upon which Dr. Baxter derives his 12% number are so dissimilar in nature to the branches Anchor actually sold, that Dr. Baxter's comparison should be rejected as a matter of law. Defendant supports this view by arguing that Dr. Baxter fails to provide specifics on the nature and type of deposits in the sample group. Without such specifics, defendant continues, an accurate comparison cannot be made. Further, defendant argues that Dr. Baxter fails to account for the fact that the transactions undertaken by the sample group are not similar to those typically undertaken in the branches actually sold. Finally, defendant argues that Anchor selected for sale its least-desirable branches which presumably would have produced lower sales prices even in a fair market. Comparing these more sickly branches, defendant argues, to the sample group is untenable because the sample group is comprised of several strong branches located in Anchor's core market which were sold nearly ten years later. These accusations shift Rule 56's burden under *Celotex*, since defendant has pointed out to the court an apparent absence of evidence to support plaintiff's case.

In response to defendant's accusations, plaintiff expounds on Dr. Baxter's reasoning. At the outset, plaintiff points out that the mainstay of Dr. Baxter's sample group is Astoria Federal in New York ("Astoria") which sold $150 million in deposits in 1997. Plaintiff reiterates that Dr. Baxter attempts to value the deposits held by the branches Anchor sold in the wake of FIRREA since a branch's worth is a function of the value of its deposits. Astoria, plaintiff argues, is an accurate measuring stick for the value of the deposits Anchor sold because:

> unlike most acquisitions during [1997–1999], which involved the sale of whole [banks] as opposed to branches, Astoria only sold deposits. (whole bank sales tend to yield higher premiums than branch sales). Moreover, like Anchor, Astoria sold enough deposits to view the transaction as a sale of a piece of a franchise, not an isolated branch or two.

Pl.'s Brf. in Opp'n to Def.'s Mot. to Dismiss at 69 (citations omitted).

Furthermore, plaintiff argues that the 12% premium is conservative since the premiums actually paid by acquirers of thrifts in New York, New Jersey, Georgia and Florida were 13%, 15%, 17% and 7%, respectively. Besides, plaintiff concludes, defendant's critiques as to Dr. Baxter's methodology go to the amount of Anchor's damages, not Anchor's entitlement to them.

Once again, the evidence proffered by the plaintiff, although perhaps a slightly closer call, is sufficient to satisfy Rule 56. Dr. Baxter's methodology indeed may be questionable. He uses a sample group comprised of different branches, different deposits, and different transactions taking place nearly ten years after the passage of FIRREA. But these sorts of questions are precisely the reason summary judgment is not appropriate. In essence, defendant is asking this court to make findings concerning Dr. Baxter's conclusions. Once again, Rule 56 is simply not the proper vehicle for this. The proper vehicle, rather, is trial, where the finder of fact can hear testimony, consider exhibits, get explanations and hear cross-examination. Accordingly, because this court believes it to be inappropriate to make findings in the context of summary judgment, defendant's arguments on the subject are rejected.

*c. Defendant's Argument that FIRREA Did Not Cause Anchor to Sell Its Branches*

Defendant's third argument with respect to the branch sales is that Anchor cannot show that the breach caused it to sell the branches. The argument is that Anchor planned to sell the branches at issue long

before the enactment of FIRREA, and would have done so regardless of FIRREA's effect.

The first prong of defendant's causation attack targets solely Anchor's branch sales in Georgia. Defendant proffers three pieces of evidence tending to show that Anchor would have sold the branches in Georgia regardless of FIRREA. The first is a memorandum written on June 2, 1989, approximately three months before FIRREA was passed, from Christine Santangelo, Anchor's senior vice president of marketing, to Mr. Large, the Chairman of Anchor's Board of Directors. The memo states that the Georgia market was "over-banked" [15] and that Anchor's deposit growth performance over the previous three years was disappointing. Santangelo Mem., June 2, 1989, at 1–3. The second piece of evidence is a memo from Cody Sickle, head of Anchor's branch system, written on November 8, 1989 which purportedly recommends the sale of most of the branches in Georgia. Thirdly, defendant points to Anchor's 1987–88 corporate plan which allegedly suggests selling all of Anchor's branches worth under $20 million. At least six of Anchor's branches in Georgia, defendant contends, did not surpass the $20 million threshold.

The second prong of defendant's causation attack targets the Florida branches. Interestingly, although plaintiff does not include the branches it sold in Florida as part of its damages calculation, defendant nonetheless insists on arguing that FIRREA did not cause their sale. The reasoning for this seemingly superfluous argument is the assertion that Anchor does not and could not include the Florida branches because doing so would be analytically impossible. [16] This analytical impossibility, defendant alleges,

also exists with respect to the Georgia branches. In the last section of its brief attacking the sale of the Florida branches, defendant fires a final salvo by averring that the Florida sales took place in 1995 after Anchor had met FIRREA's capital requirements, and that, therefore, these sales are causally disconnected from the breach.

Defendant's parting salvo, the third prong of its causation attack, is the argument that Anchor's branch sales in New York and New Jersey were not causally connected to the breach because Anchor had achieved capital compliance *before* the branches were sold. Moreover, Anchor argues, "even assuming that the breach mandated certain branch sales, those that Anchor effected or was in the process of effecting prior to the other New York/New Jersey sales, may well have sufficed to alleviate Anchor capital deficit." Def.'s Mot. for Summ. J. at 57.

Plaintiff has several responses to these allegations. The first refutes defendant's contention that Anchor would have exited from the Georgia thrift market regardless of FIRREA. Plaintiff cites the depositions of William Schneider (Anchor's President) and Mr. John Brull (Anchor's Executive Vice–President and then CFO), stating that Anchor may indeed have been selling some branches in Georgia and elsewhere, but intended to open others. *See* Dep. of William Schneider at 106–107 ("but as we were selling branches we were also opening new ones"); Dep. of John Brull at 245 ("we might have sold some of those branches . . . . But clearly I think we were in a growth mode and would have replaced them either with de novo moves or acquisitions").

Additionally, plaintiff asserts the statements of Mr. Brull and Mr. Schneider to

---

**15.** Although neither party defines the meaning of "over-banked," the court assumes by the use of the modifier "over" that it has an unfavorable *connotation such as the term "over-hyped"* and means that the relevant market is saturated with banks. Conceivably, but not necessarily, the result would be greater competition and lower prices for banking services with resulting lower profit margins. Banks would have to increase interest rates to attract more depositors. Another possible result, however, could be a spike in demand for consumer services and greater profits as more and more consumers use banking

services spurred on by lower prices. Banks would then possess more assets on hand to leverage.

**16.** It is not altogether clear but it appears that defendant is arguing that it was either economic conditions, misfeasance, or both that led to the failure of the Florida branches. One thing is clear, however, defendant discounts even the possibility that it was FIRREA and the breach that led to any of the branch failures. Def. Brief Mot. Sum. Judgment. at 55–57.

rebut defendant's argument that the Cody Sickle memo shows Anchor was pulling out of Georgia long before FIRREA. Plaintiff further notes that the Cody Sickle memo was written in November *after* FIRREA passed, and therefore cannot be considered evidence of what plaintiff intended to do before the breach.

Plaintiff next takes issue with defendant's reliance on Christine Santangelo's memo arguing, in essence, that Ms. Santangelo was taken out of context. Plaintiff notes that Ms. Santangelo's conclusions that Georgia was "over-banked" and that Anchor was performing poorly in Georgia were followed by a disclaimer that she had only performed an "initial analysis" and that a "comprehensive examination of the merits of each office and the services" should be made. Santangelo Mem., June 2, 1989, at 7.

In addition to the evidence refuting defendant's arguments, plaintiff also asserts evidence to show that FIRREA was, in fact, the cause for the sale of the branches not only in Georgia, but in Florida, New York and New Jersey.

Two pieces of evidence are particularly probative. The first is Mr. Large's July 20, 1989 presentation to Anchor's Board of Directors. That presentation, given just one month before FIRREA was passed, lays out Mr. Large's understanding that, assuming FIRREA passed, Anchor would be forced to sell the Georgia branches located outside the Atlanta area. Presentation by James M. Large to Anchor Bd. for Dir., July 20, 1989 at 4,45 (reprinted in App. to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 991a, 994). The second piece of evidence is the Capital Plan that Anchor submitted to the OTS on January 8, 1990. The Capital Plan was required by the OTS and set forth Anchor's plans to achieve capital compliance under FIRREA. The plan is replete with evidence suggesting that FIRREA was the sole cause for Anchor's branch sales. *See* 1990 Capital Plan at introduction p. ll, enclosure B, section X p. 7 (reprinted in App. to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 1058–1079).

The court is again faced with a "he-said-she-said" situation. Defendant has pointed out to this court that the memoranda from Ms. Santangelo and Mr. Sickle tend to show a lack of evidence that FIRREA was the sole cause of Anchor's branch sales in Georgia. Rather, defendant asserts, the Sickle and Santangelo memo's should be taken to mean that Anchor planned to sell the branches at issue long *before* passage of FIRREA. Similarly defendant also points out that at least some of the branches Anchor sold in New York and New Jersey were sold *after* Anchor achieved capital compliance, suggesting the causal link is tenuous.[17]

On the other hand, plaintiff points to different portions of the Sickle and Santangelo memo's casting doubt on defendant's proposition that Anchor intended to sell the branches before FIRREA was passed. Indeed, plaintiff notes that the Sickle memo was a post-breach document and therefore cannot be considered probative of Anchor's pre-breach intent to sell the branches. Plaintiff also provides the court with Mr. Large's presentation to Anchor's Board of Directors, as well as the 1990 Capital Plan which suggest that Anchor sold the branches solely to comply with FIRREA.

*Celotex* once again controls. Defendant has pointed out that there is an absence in evidence as to an essential element of plaintiff's case—causation—and thus has shifted the burden onto plaintiff. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. Plaintiff, as it must, has proffered evidence suggesting a reasonable fact-finder could resolve the matter of causation in plaintiff's favor. *Id.* at 322, 106 S.Ct. 2548; *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). Thus, Rule 56 is satisfied because a question of fact as to causation is raised. *Bluebonnet Savings Bank, FSB*, 266 F.3d at 1356 ("Causation is also a question of fact reviewed under the clear error standard."). This is true even as to the branches sold after Anchor achieved capital compliance. *Cf. Franklin Federal Savings Bank v. United States*, 55 Fed.Cl. 108, 126 (2003) (finding in the reliance damages context that

---

17. It is unnecessary for the court to address defendant's claim with regard to the Florida

branches since there are no damages arising out of those sales.

"plaintiffs are entitled to the costs they incurred raising replacement capital for all of the supervisory goodwill lost due to FIRREA, not the bare minimum needed to get [plaintiff] over the regulatory compliance threshold.") This court therefore rejects defendant's arguments that, as a matter of law, FIRREA was not the cause of Anchor's branch sales.

### d. Whether Anchor Failed to Mitigate or Fully Mitigated

Defendant's argument as to mitigation is that after returning to capital compliance in 1993, Anchor simply did nothing to replace the branches it sold. Defendant points to Anchor's 1993 Annual Report which reveals that Anchor had a surplus of core and tangible capital with which it could have replaced the branches it allegedly sold in order to comply with FIRREA. Defendant further asserts that Anchor/Dime acquired nearly $4 billion in deposits in the years following plaintiff's return to capital compliance, but that none of these deposits went to mitigating the damages from the branch sales. More specifically, defendant argues that Anchor acquired Lincoln Savings and Loan of New York in August of 1994, which provided Anchor with nearly $1.8 billion in deposits, but that none of those proceeds went toward mitigation.

In response, plaintiff maintains that the deposits Anchor gained after it achieved regulatory compliance should not go toward mitigation because these deposits would have been attained even if Anchor had not sold the branches in Georgia, Florida, New York and New Jersey. Thus, Anchor argues, regardless of the breach, Anchor would have acquired more deposits generally, and specifically it would have acquired Lincoln Savings and Loan. As evidence for this argument, plaintiff cites the deposition of Mr. Large, in which he stated that "any bank, virtually any bank, is always interested in developing a branch structure, and so Anchor and then Anchor/Dime would have been interested in acquiring branches as a matter of course." Dep. of James Large at 276. Similarly, plaintiff also cites the deposition of Cody Sickle who asserted "we would have had an interest in buying any of the strong franchis-es at any points in time that we could." Dep. of Cody Sickle at 448.

The issue of mitigation as to the branch sales is not unlike the issue of mitigation relating to RFC. Thus, the issue before the court is whether Anchor took reasonable steps after the breach to avoid damages. *See* RICHARD A. LORD, WILLISTON ON CONTRACTS § 64:27 (4th ed. 2003) ("Damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered either as not having been caused by the defendant's wrong or as not being chargeable against the defendant."). This question, however, cannot be answered on summary judgment because it would require the court to presently make a factual finding as to whether Anchor's refusal to apply the proceeds from the Lincoln acquisition toward acquiring replacement thrifts in Georgia, New York and New Jersey was a reasonable course of action. It is inappropriate for such a determination to be made on summary judgment. *Id.* ("What is a reasonable effort to avoid the injurious consequences of a breach is a question of fact.").

Plaintiff also argues that Anchor's situation is analogous to that of a "lost volume seller." The Restatement (Second) of Contract § 347, illustration sixteen, best describes this doctrine:

A contracts to pave B's parking lot for $10,000. B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000. A's business could have been expanded to do both jobs. Unless it is proved that he would not have undertaken both, A's damages are based on the net profit he would have made on the contract with B, without regard to the subsequent transaction.

RESTATEMENT (SECOND) OF CONTRACTS § 347, illus. 16 (1981).

Plaintiff argues that because Anchor could and would have held both the branches it sold, as well as the branches it acquired after achieving capital compliance, it's acquisition of Lincoln should not be viewed as mitigation, but rather as lost volume. Even assuming this is true, comment f to section 347 of Restatement clearly states that whether a

party is a "lost volume seller" is a question of fact:

> Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract. Since entrepreneurs try to operate at optimum capacity, however, it is possible that an additional transaction would not have been profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach. It is sometimes assumed that he would have done so, *but the question is one of fact* to be resolved according to the circumstances of each case.

RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. f (1981).

The Restatement makes clear that the issue of whether Anchor is a "lost volume seller" is a question of fact. Were it otherwise, this court would be faced with the impermissible duty of making findings as to whether Anchor could and would have held both the branches it sold, and bought Lincoln. Rule 56 does not permit this court to do so on summary judgment.

### 3. *Anchor's "Gross-up" Claim*

■ As explained above, Anchor seeks to have this court add $220 million to the lost profits in order to cover the future taxes on its award.[18] This so called "gross-up" is necessary, plaintiff argues, in order to make Anchor whole. Plaintiff cites several cases purportedly supporting the "gross-up" idea including *Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), *Centex Corporation v.*

*United States,* 55 Fed.Cl. 381 (2003) and *LaSalle Talman Bank,* 45 Fed.Cl. 64 (1999).

The government moves for summary judgment on this claim with its usual speculation assault. Defendant contends that, even assuming that the award were taxable, it is too speculative as a matter of law for this court to determine the rate at which Anchor's award, if any, would be taxed. There is some support for the government's position.

In *LaSalle Talman,* the plaintiff presented evidence at trial on a gross-up claim. The tax expert who testified on behalf of the plaintiff concluded that any award the plaintiff received would be taxed at the corporate rate of 40%. In forming this opinion, however, the expert had to make several critical assumptions. First, that plaintiff's award would, in fact, be taxable as "income" under the Internal Revenue Code. Second, that plaintiff's marginal tax rate would have remained at 40% from the time of the breach to the time of trial. And third, that plaintiff's tax rate was likely to remain at 40% into the future. These assumptions, the court ruled, were simply too conjectural to serve as the basis of a recovery. The court thus denied plaintiff's gross-up claim. In denying the claim, the *LaSalle* court concluded that the expert's assumptions were simply too speculative to serve as the basis for a recovery. *LaSalle Talman Bank, FSB,* 45 Fed.Cl. at 110.

But this court respectfully rejects this conclusion, at least with respect to an action at the summary judgment phase. Illustrative is *Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), where the Supreme Court reversed the trial court for refusing to admit evidence on the effect of taxes on the earnings of a locomotive fireman who was killed in a train wreck.

In this case the administratrix of the decedent's estate brought an action against the railroad to recover the decedent's future earnings under the Federal Employees Liability Act, 35 Stat. 65, as amended, 45 U.S.C. § 51 *et seq.* ("FELA").[19] One of the issues

---

18. All of Anchor's lost profits calculations were performed on a pre-tax basis.

19. FELA provides in pertinent part:
> Every common carrier by railroad while engaging in commerce between any of the sever-

before the Court was whether evidence to show effect of income taxes on decedent's estimated future earnings was admissible. In holding such evidence was admissible, the Court held:

> In a wrongful-death action under the FELA, the measure of recovery is the damages ...[that] flow from the deprivation of the pecuniary benefits which the beneficiaries might have reasonably received ... The amount of money that a wage earner is able to contribute to the support of his family is unquestionably affected by the amount of the tax he must pay to the Federal Government. It is his after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies.

*Norfolk & Western Railway Co.,* 444 U.S. at 493–494, 100 S.Ct. 755 (citations omitted).

Of import to this case, the Supreme Court discussed the role of federal trial courts in undertaking the speculative inquiry of what the tax structure might be in the future, and the rate at which any award might be taxed:

> Admittedly there are many variables that may affect the amount of a wage earner's future income-tax liability. The law may change, his family may increase or decrease in size, his spouse's earnings may affect his tax bracket, and extra income or unforeseen deductions may become available. But future employment itself, future health, future personal expenditures, future interest rates, and future inflation are also matters of estimate and prediction. Any one of these issues might provide the basis for protracted expert testimony and debate. But the practical wisdom of the trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complex-

ities of modern life. We therefore reject the notion that the introduction of evidence describing a decedent's estimated after-tax earnings is too speculative or complex for a jury.

*Id.* at 494, 100 S.Ct. 755.

Anchor here is asserting a gross-up claim based on the expert testimony of Robert Miles. Mr. Miles asserts that any award to Anchor will be taxed at about a 40% rate, based on Washington Mutual's tax rate from 1996 to the present. Consequently, Mr. Miles makes four assumptions: (1) that Anchor's award would be taxable as "income," (2) that Anchor's marginal tax rate would have remained at about 40% absent the breach, (3) that Anchor's tax rate will remain at about 40% into the future, and (4) that Anchor's tax rate from 1996 to the present would have been the same as Washington Mutual's tax rate from 1996 to the present.

Although, with the exception of the last factor, these contentions are essentially the same as those rejected by the *LaSalle* court, they nonetheless raise a triable issue as to sufficiency. Indeed, the *LaSalle* court only rejected plaintiff's gross-up claim after a full trial on the merits. Furthermore, this evidence, which is of the same type held by the Supreme Court to be admissible in *Liepelt,* is neither "too speculative [n]or complex for a [trier of fact]." *Norfolk & Western Railway Co.,* 444 U.S. at 494, 100 S.Ct. 755. Anchor here has met its burden under *Celotex* by demonstrating that the record contains credible evidence establishing a material issue of fact once a movant has challenged the sufficiency of the evidence or claim. *See Celotex Corporation,* 477 U.S. at 323–324, 106 S.Ct. 2548. Plaintiff has earned the right to submit this evidence to the trier of fact.

4. *Anchor's Alternative Expectancy Damages Theory: The Hypothetical Stock Offering*

■ As explained above, Anchor asserts an alternative argument to its lost profits

---

al States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign

nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative.

claim. The alternative damage measurement explained in section II.A.4 seeks to value the cost to Anchor of replacing the lost supervisory goodwill through a hypothetical preferred stock offering. Plaintiff asserts several arguments for this hypothetical model, however, as is shown below, valuing the cost of replacing supervisory goodwill through a hypothetical stock offering has been rejected almost uniformly by this court.

Defendant's cardinal argument against plaintiff's hypothetical model is rooted in this court's recent case law. Defendant points out that models nearly identical to plaintiff's have been rejected by this court in several cases because they do not reflect costs actually incurred by the thrift. *See Citizens Financial Services, FSB v. United States,* 57 Fed.Cl. 64, 71–72 (2003); *Fifth Third Bank of Western Ohio,* 55 Fed.Cl. at 243 (2003); *Franklin Federal Savings Bank,* 55 Fed.Cl. at 135–139; *Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 697–699 (2002); *Bank United of Texas v. United States,* 50 Fed.Cl. 645, 654–655 (2001); *Landmark Land Co. v. United States,* 46 Fed.Cl. 261 (2000), *aff'd in part, vacated in part, reversed in part, and remanded,* 256 F.3d 1365 (Fed.Cir.2001); *Glendale Federal Bank v. United States,* 43 Fed.Cl. 390, 398 (1999), *aff'd in part, vacated in part, and remanded,* 239 F.3d 1374 (Fed.Cir.2001); *California Federal Bank v. United States,* 43 Fed.Cl. 445, 461 (1999), *aff'd in part, vacated in part, and remanded,* 245 F.3d 1342 (Fed.Cir.2001); *LaSalle Talman Bank,* 45 Fed.Cl. at 103 (1999), *aff'd in part, vacated in part in other grounds,* 317 F.3d 1363, 1375 (Fed.Cir.2003); *see also Home Savings of America, FSB, v. United States,* 57 Fed.Cl. 694, 728 (2003) (accepting cost of replacement capital model because model was based on actual stock offering, rather than hypothetical offering). The underlying thrust of these cases, defendant asserts, is that plaintiffs in *Winstar* cases are prohibited from claiming damages from costs the bank did not *actually* incur. Under Anchor's hypothetical model, defendant continues, Anchor incurred no actual costs because Anchor did not actually perform the stock offering contemplated.

Plaintiff contests defendant's arguments on the law by distinguishing some of the cases cited above on various factual differences—some of which appear to the court to fit the oft-used maxim of "a distinction without a difference." In *Cal Fed* and *Glendale,* Anchor argues, plaintiffs there sought replacement costs *higher* than the amount of supervisory goodwill they lost due to FIR-REA. In *Glendale,* for instance, Anchor points out that plaintiff sought $1.2 billion in costs to replace only $451 million in wiped out supervisory goodwill. Likewise in *Cal Fed,* Cal Fed sought $1 billion to replace on $390 million of goodwill. Further, Anchor notes, in *Cal Fed* the plaintiff actually did replace its capital, whereas Anchor did not. These distinctions, plaintiff argues, make the claims in *Cal Fed* and *Glendale* somehow "dramatically" different from those in the case at bar. Pl.'s Brf. in Opp'n to Def.'s Mot. for Summ. J. at 81.

In a similar vein, plaintiff distinguishes *Bank United* and *Columbia First* on the grounds that the thrifts in those cases did not fall out of capital compliance after FIR-REA. Moreover, *Bank United,* unlike Anchor was able to fully mitigate its damages, and thus there was no need for the court to award replacement costs. *Franklin* and *Fifth Third Bank,* plaintiff continues, are distinguishable in that the plaintiffs there actually did raise capital to replace the supervisory goodwill, whereas Anchor did not. Finally, plaintiff distinguishes *Landmark* on two grounds: (1) the plaintiff thrift there, unlike Anchor, ultimately failed, and (2) since there was no evidence that the thrift's failure was due to the elimination of goodwill, the court refused to award damages of any type.

Having purportedly distinguished the applicable case law, plaintiff thereafter analogizes its case to *Glass et al. v. United States,* 47 Fed.Cl. 316, 327–329, *rev'd on other grounds,* 258 F.3d 1349 (Fed.Cir.2001), where the court approved of a model nearly identical to Anchor's. Plaintiff points out that the *Glass* court expressly found that, although the model was hypothetical, "the model represents damages, a valid calculation for the usefulness of something that was contracted for, not an actual transaction." *Glass,* 47

Fed.Cl. at 328–329. To align itself as much as possible with *Glass,* Dr. Baxter patterns his calculations after those performed by Dr. Heggestad, the primary expert on the hypothetical model used in *Glass.* Plaintiff then cites *Glass* as persuasive precedent as to why this court should adopt the hypothetical stock model and award Anchor replacement costs.

Contrary to plaintiff's arguments, however, this court refuses to side with *Glass* and instead aligns itself with the myriad other cases rejecting models similar to the one plaintiff puts forward. This court, except for *Glass,* which was decided well-before the spate of current more mature *Winstar* cases, has repeatedly rejected "a hypothetical cost of replacement capital model, when, in fact, the thrift pursued another strategy." *Citizens Financial Services,* 57 Fed.Cl. at 71 (citing *LaSalle Talman,* 45 Fed.Cl. at 103; *Columbia First,* 54 Fed.Cl. at 699; *Fifth Third Bank,* 55 Fed.Cl. at 243). In this case, Anchor did indeed pursue another strategy— it shrunk by selling RFC and the branches in Georgia, New York and New Jersey—and, significantly, is seeking lost profit damages for those sales. The decision to shrink not only reduced Anchor's risk-based capital requirement, but simultaneously resulted in earned revenues which replaced the regulatory goodwill with tangible capital. Thus, plaintiff's damages can and should be based on these actual undertakings, rather than on a speculative model based on an event that never took place. *See LaSalle Talman,* 45 Fed.Cl. at 103 ("plaintiff's damages should be calculated on the basis of the *actual* means by which it filled its capital deficit") (emphasis added).

Moreover, this court finds summary judgment is appropriate to apply to plaintiff's hypothetical model despite various courts' resolution of this issue at the trial level. *See Citizens Federal Bank v. United States,* 52 Fed.Cl. 561, 566–567 (2002), *Home Savings of America v. United States,* 51 Fed.Cl. 487, 499–500 (2002), *LaSalle, Bank United, Glendale,* and *Cal Fed.* Three cases prior to this one have determined this issue on summary judgment, and we find the reasoning therein compelling. *See Fifth Third Bank,* 55 Fed. Cl. at 243–244 ("the law does not recognize [plaintiff's] theory"); *Columbia First,* 54 Fed.Cl. at 699 (holding on summary judgment "the court sees no reason to use hypothetical mitigation costs as a measure of damages now"); *Franklin Federal Savings Bank,* 55 Fed.Cl. at 138 ("the court does not see the utility of submitting another cost of replacement capital claim to trial based on a damages model which is similar to, and just as far afield, as those emphatically rejected in *Glendale* ('inherently odd'), *Cal Fed* ('not credible'), and *Bank United* ('absurd on its face')"). Therefore, because plaintiff's hypothetical cost of replacement model is not based on the costs Anchor actually incurred in meeting its regulatory capital deficit (and, conversely, because Anchor in fact chose to sell assets to replace regulatory capital and now seeks lost profits from these sales), this court grants the government's motion for summary judgment on this claim.

### B. *Anchor's Reliance Damages*

"The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Glendale Federal Bank,* 239 F.3d at 1383; RESTATEMENT (SECOND) OF CONTRACTS § 344(b) ("[Judicial remedies serve to protect the promisee's] reliance interest, which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made."); 3 DAN B. DOBBS, LAW OF REMEDIES § 12.3(1) (2d ed. 1993) ("The reliance recovery is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise."). As a general proposition, these damages are available for injuries resulting from activities that occurred either before or after the breach. *Glendale Federal Bank,* 239 F.3d at 1383; CALAMARI & PERILLO, THE LAW OF CONTRACTS, § 14.9 ("[A] party may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."); RESTATEMENT (SECOND) CONTRACTS § 350 cmt. g, illus. 18; *cf.* RESTATEMENT (SECOND) CONTRACTS § 349(b) ("As an alternative to the measure

of damages stated in § 347 [expectancy damages], the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance....").

As explained above, Anchor has put forward a complex and somewhat novel method for calculating its reliance damages. Due to the complex nature of the claim, the reader may wish to be refreshed with the intricacies of the claim by reviewing section II.B supra.

Essentially, the government's arguments on plaintiff's reliance claim can be distilled into three alternative contentions: (1) the assumption of the ailing S & L's liabilities is not an actual cost as required under Federal Circuit case law, (2) Anchor is double-counting certain losses, and (3) Anchor underestimates the value of the benefits it received as a result of the contracts which must be credited to the government.

*a. Whether Assumption of Net Liabilities Is an Actual Cost*

The critical documents to this issue are plaintiff's exhibits 2, SS–5 and SS–6, all found in the appendix to this opinion. Starting with SS–5, Anchor asserts that line 1 reflects its actual costs in assuming the ailing thrifts it purchased under the contracts in this case. To understand why Anchor makes this assertion, it is necessary to dissect the components of line 1.

Line 1 has a history. In the original version of the expert report, Dr. Baxter calculated Anchor's reliance damages using a theory that has since been rejected by the Federal Circuit and this court in *Glendale II* and *III*.[20] That is, Anchor's original claim measured the cost of Anchor's reliance damages

by the amount of goodwill generated by the supervisory mergers—$20 million in lost goodwill equaled $20 million in reliance damages. Judge Smith in *Glendale III*, however, rejected this methodology because "it measures the market value of the assumed liabilities as a cost, but does not answer the question of whether Glendale was called upon to pay a net cash outlay in the amount of the assumed excess liabilities." *Glendale III*, 54 Fed.Cl. at 13.

In the wake of *Glendale III*, Anchor recalibrated its reliance claim. Cleverly, Anchor recognized that defendant's expert, Mr. Barefoot Bankhead, made the same criticism the *Glendale III* court made of Anchor's claim—that is, the claim was based on the value of the supervisory goodwill, rather than *actual* out-of-pocket expenses. Even more cleverly, Anchor then asked Mr. Bankhead to perform the calculations necessary to compute Anchor's actual out-of-pocket costs stemming from the supervisory acquisitions. Mr. Bankhead's calculations on this point are seen in exhibit SS–6.[21]

What SS–6 shows is that Mr. Bankhead took all the debts and liabilities of all the ailing thrifts Anchor acquired, and then subtracted from that amount things which Mr. Bankhead considered part and parcel of the purchase method of accounting—*i.e.*, things akin to supervisory goodwill. Specifically, these things include: (1) discount accretions, (2) discount on loan sales, (3) premium amortization, (4) goodwill amortization, (5) servicing amortization, and (6) write-offs of servicing. Mr. Bankhead and Anchor contend that the number remaining reflects plaintiff's out-of-pocket costs. This court, however, disagrees.[22]

---

**20.** *Glendale I* was the original trial court decision by then Chief Judge Loren Smith and is reported at 43 Fed.Cl. 390. *Glendale II*, of course, was the Federal Circuit's opinion which remanded the case and is reported at 239 F.3d 1374. *Glendale III* is Judge Smith's opinion after remand and is reported at 54 Fed.Cl. 8.

**21.** At oral argument, Anchor's counsel produced a supplemental appendix which contained a document produced by Mr. Bankhead which is similar to SS–6. The document, referred to as exhibit H, is no different that SS–6, save for the fact that it covers the years from 1990 (the date SS–6 stops) to 1998.

**22.** Defendant may, in fact, be making an argument that Anchor has failed in showing any specific realized costs, but because the government's brief does not clearly illuminate the issue, this court raises the issue *sua sponte*, as is within its power. *See Celotex*, 477 U.S. at 326, 106 S.Ct. 2548 ("the district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*...") (citing C. WRIGHT, A MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 at 28–29 (1983)).

*Glendale III* makes clear that the focus in a reliance damages inquiry is on an *actual* "net cash outlay." *Glendale III*, 54 Fed.Cl. at 13. This court reads that to mean a specified realized loss—an actual cash outlay, a payment made, a concrete and measurable cost. These types of losses are to be distinguished from the paper losses that result when an acquiring company assumes the debts of its acquiree, and simply marks those debts down on its balance sheet in the red area. Until those debts are paid, they cannot constitute reliance damages.

Support for this court's requirement and reading of the term "actual cost" is found in the Federal Circuit's holding in *Glendale II*. There, the Federal Circuit not only said "reliance damages will permit a more finely tuned calculation of the *actual* costs sustained by plaintiff as a result of the government's breach" (*Glendale II*, 239 F.3d at 1383) (emphasis added), but thereafter provided examples of what "actual costs" are. The examples included increased OTS assessments, increased deposit insurance premiums, transaction costs and custodial fees. *Glendale II*, 239 F.3d at 1383. These types of payments are realized costs, and they are far different from the paper calculation which results when a company assumes the debt of an acquired entity.

This definition of actual costs must also be understood concomitantly with the burden imposed under *Celotex*. Anchor must come forward with sufficient evidence showing that the costs represented in SS–6 are specific, actual, realized losses. Anchor fails to do so. Although Anchor cleverly employs the calculations of its adversary's expert, that alone does not satisfy Rule 56 and *Celotex*. Rather, what Anchor must show is that line 15 of SS–6 (also found in line 1 of SS–5) is comprised of actual cash outlays. Instead, what Anchor has shown is that Mr. Bankhead subtracted numerous things such as discount accretions and premium amortization from the acquired thrift's net debts and liabilities. The number remaining after those subtractions are made is not necessarily a number reflecting Anchor's realized losses. It is simply the number reflecting debts and liabilities that Anchor assumed in the acquisitions minus (1) discount accretions, (2) discount on loan sales, (3) premium amortization, (4) good will amortization, (5) servicing amortization, and (6) write-off's of servicing. The remainder, line 15 of SS–6, is certainly a hypothetical figure. Whether that figure encompasses *actual specified realized loses* is thus a matter of conjecture. It may or it may not. Indeed, theoretically, line 15 could be comprised in-part or in-whole of debts or liabilities that Anchor has accrued till this day.

In its brief in opposition to summary judgment, Anchor asserts that "*[a]fter* the acquisitions, Anchor disposed of acquired assets and liabilities and incurred *additional* losses, as a result of changes in the interest rates and other operating losses as measured by defendant's expert Bankhead." Pl.'s Brf. in Opp'n to Def.'s Mot. for Summ. J. at 90 (emphasis original). This may be true, but exhibit SS–6 and line 1 of SS–5 do not show that. All they show is that the numbers represent the acquired thrift's net liabilities adjusted to exclude discount accretions, premium amortization *et cetera*. Without sufficient evidence as a buttress, Anchor's assertion falls as an *ipse dixit*.

Without a positive showing by Anchor that the numbers in line 1 of SS–5 and line 15 of SS–6 represent actual and real losses, and without, for that matter, anything else in the record to support its claim, this court is faced with an absence of evidence that Anchor actually incurred such losses. As a result, Anchor cannot recover reliance damages as a matter of law. *See Fifth Third Bank of Ohio*, 55 Fed.Cl. at 245–246 (granting summary judgment on plaintiff's reliance damages claim because "neither *Glendale* nor *Cal Fed* stands for the proposition that the assumption of net liabilities constitutes an appropriate measure of reliance damages").

*b. Alternative Grounds for Granting Summary Judgment on Anchor's Reliance Claim*

In addition to plaintiff's failure to meet the *Glendale III* definition of reliance damages, the court finds summary judgment should be granted on this claim because: (1) plaintiff's reliance claim is in essence a prohibited claim for restitution for the value of the supervisory goodwill erased by FIRREA, and (2) plaintiff fails to rebut defendant's contention

that Anchor is double-counting certain losses under its reliance claim.

Addressing the first argument, line 4 of SS–5 is the focal point of the analysis. If one follows the notes at the bottom of SS–5, the components of line 4 are revealed. The notes explaining line 4 direct the reader to exhibit 2 of Dr. Baxter's report. Exhibit 2 (see appendix) has four columns across the top: (1) total before acquisition, (2) market-to-market adjustments, (3) cash FSLIC assistance, and (4) total after acquisition. For the purposes of this opinion only the first two columns—total before acquisition and market-to-market adjustments—are important. Furthermore, on the horizontal axis of exhibit 2, only lines 19 through 24 are important, and line 24 is truly the focal point of the controversy. Line 24 has two numbers, both of which are identical except for the fact that the number under the first column is negative (as indicated by the parentheses) and the number beneath the second column is positive. This difference is crucial because the negative $26.502 million beneath the first column is debt, and the positive $26.502 million is the same debt transformed into supervisory goodwill.

What Dr. Baxter does is take the $26.502 million beneath column one and uses it as the basis for line 4 of SS–5. More specifically, Dr. Baxter takes the total debt assumed by Anchor in all the supervisory acquisitions ($26.502 million), and then subtracts from that number the debt attributable to acquisitions in which this court found there was no contract—Tri–City, Heritage, Standard, *etc.* The result, Dr. Baxter extols, is the "deficit from contractual acquisitions before purchase accounting adjustments," a.k.a. line 4.

This number of $193.584 million is not a proper component of a reliance damages claim for several reasons. First, the $26.502 million is simply goodwill in sheep's clothing. Although plaintiff has cleverly adopted the calculations of defendant's expert, Mr. Bankhead, plaintiff fails to note a crucial distinction. Mr. Bankhead's calculations were performed in the restitution context, rather than in the reliance context.

What the *Glendale II* court made clear was that the value of lost supervisory good-

will could not be recovered in the restitution context. *Glendale II*, 239 F.3d at 1383 ("keying an award to liability that was at most a paper calculation, and which ignores the reality of subsequent events as they impacted on the parties, and particularly the plaintiff, is not justifiable."). In response to this, Anchor has taken Mr. Bankhead's calculations of restitution losses, and merely re-asserted them as reliance losses. Simply switching names, however, does not transform lost supervisory goodwill into recoverable damages because, as explained above, reliance costs must be *actual*, i.e. realized, if they are to be recovered. Here, Anchor has simply labeled the $26.502 million as a "cost" but has not produced any affirmative evidence showing that it made actual cash outlays in this amount. Without such evidence, line 4 of SS–5 cannot serve as the basis for reliance damages. Therefore, as a matter of law, the $193.584 million in line 4 of SS–5 is not recoverable under a reliance theory.

Alternatively, the government argues that the numbers represented in lines 1 and 4 of SS–5 are simply different ways of counting the same number. This may or may not be true, but plaintiff fails to produce evidence rebutting this contention.

As explained above, line 1 of SS–5 is derived from lines 1 and 15 of SS–6. Also as explained above, there is nothing in the record that shows of what, exactly, line 1 of SS–6 is comprised—this court has only been shown that line 1 is not discount accretions, premium amortization, *et cetera*. Defendant asserts that line 1 off SS–6 is comprised of the same things as lines 19 through 24 of exhibit 2 which, of course, is the source for the number in line 4 of SS–5. By defendant pointing out that the numbers in lines 1 and 4 of SS–5 may represent a double-count, the burden under *Celotex* shifts onto Anchor to persuade this court that there is sufficient evidence to the contrary.

In bearing this burden, plaintiff produces no other evidence than the exhibits discussed. Plaintiff asserts that it is not double-counting because: "the thrifts acquired by Anchor had, prior to the acquisitions, accumulated net deficits on a book basis.

Those accumulated losses make up the net worth deficit that Dr. Baxter calculates. *After* the acquisitions, Anchor disposed of acquired assets and liabilities and incurred *additional* losses..." Pl.'s Brf. in Opp'n to Def.'s Mot. for Summ. J. at 90 (emphasis original). First, as stated above, this may be true, but lines 1 and four of SS–5 do not reflect that because they are not proof of actual realized losses.

Second, this statement misses the point. What plaintiff must produce is evidence that the numbers found in line 1 of SS–6 are not in any way derived from the numbers in lines 19 through 24 of exhibit 2. More specifically, plaintiff must have shown that the numbers in line 1 of SS–6 are not "Retained Income," "Other," or "Equity Securities Valuation" (which defendants say are the pre-tax earnings found in line 1 of SS–6, which is the gist of their double counting argument). Plaintiff has made no such showing.

Plaintiff's statements at oral argument do change this. In responding to the charge of double counting, Anchor's counsel stated:

> Now, [counsel for defendant] says it's double accounting. There is a fundamental disagreement among the experts about how it's double accounting. I don't think he and I can reconcile it for you. That's an issue that just has to go to trial. Even if it is double accounting, we at least get one of those numbers; you don't throw out both of them.

August 20, 2003 Tr. at 176–177. This, however, is a mere conclusory statement. Plaintiff has failed to proffer any evidence of the expert debate to which its counsel refers. Moreover, the simple assertion that when two numbers are allegedly double counted, one must be recoverable, is not enough to satisfy *Celotex*. Again, plaintiff must produce some affirmative evidence that the numbers are derived from different sources. Absent such evidence, Anchor cannot defeat defendant's motion for summary judgment.

### c. Whether Anchor Underestimates the Benefits It Received from the Government

Like restitution damages, a plaintiff's reliance damages must be offset by any benefits it received under the contract. 3 DAN B. DOBBS, LAW OF REMEDIES § 12.3(1), at 51–52 (2d ed.1993) ("the reliance damages recover is a recovery for net reliance loss, so that the defendant is credited with any benefit plaintiff received from the expenditures in reliance.").

In this case, defendant contends that Anchor is underestimating various benefits it received under the contracts. More specifically, the government contends that Anchor underestimates the value of the ICC, the value certain tax benefits Anchor obtained, and the reversion value the branches acquired. Furthermore, the government contests Anchor's position as to the time window within which these benefits should be measured. Anchor calculates the benefits from the date of the contracts until 1989, however, defendant contends the benefits continue to flow to Anchor to this very day.[23]

As explained above, determining the fair market value of an asset or a benefit requires expert testimony, cross-examination and findings of fact. This court simply cannot determine the value of FSLIC's forbearance, for example, in the summary-judgment context. More fundamentally, however, because Anchor has failed to show any actual cash losses, there are no reliance damages against which these benefits should be offset. As a result, this court denies as moot defendant's motion for summary judgment for the benefits Anchor received in the reliance damages context.

### C. Anchor's Wounded Bank Expenses

■ The last group of expenses at issue are Anchor's so called "wounded bank" damages. As stated above, these expenses include legal fees, printing fees, excess FDIC assessments and the like. For the purposes of its motion for summary judgement, the government groups the various wounded bank expenses into three categories: (1)

---

**23.** Defendant does not take issue with Anchor's calculation of the value of the servicing rights seen in line 6 of exhibit SS–5.

management time; (2) transaction costs, which include investment banking and advisory fees, accounting fees, printing fees, and legal fees; and (3) excess FDIC assessments. This court considers each in turn.

Anchor's claim to management time was described above, however it is useful to revisit it here. The claim is described in Anchor's brief as follows:

> Anchor is entitled to the value of management salary expenses that were devoted to crafting and implementing Anchor's Capital Plan, *i.e.*, responding to the breach. Here the question is not whether Anchor would have incurred the expenses anyway, but whether it was deprived of the value of its senior mangers' time that was diverted from building Anchor into a more profitable institution

Pl.'s Brf. in Opp'n to Def.'s Mot. for Summ. J. at 97 (internal citations omitted).

This court has difficulty seeing how these fees are recoverable. Most probably, Anchor's management had set salaries long before the breach. *See LaSalle Talman Bank, FSB*, 45 Fed.Cl. at 97–98 ("It is clear, however, as defendant argues, that Talman did not incur any *direct* costs for officer's time due to the government's breach.") (emphasis original). The issue, however, is one of causation—did the breach cause Anchor to expend salary expenses it otherwise would not have. Causation, as discussed above, is a question of fact, and therefore this court refuses to grant summary judgment on the issue. *Bluebonnet Savings Bank, FSB*, 266 F.3d at 1356 ("Causation is also a question of fact reviewed under the clear error standard.").

Similarly, the government's argument as to Anchor's transaction costs is one of causation. The government argues "Anchor cannot demonstrate that the expenses associated with any of the transactions that occurred after Anchor's return to capital compliance were a direct result of the loss of Anchor's contractual regulatory capital. There is no logical, and can be no causal, connection to the allegedly breach contracts when Anchor had already returned to capital compliance." Def.'s Mot. for Summ. J. at 85 (citations omitted). As *Bluebonnet* makes clear, causation is a question of fact. Moreover, as this

court previously found, the fact that Anchor returned to capital compliance does not automatically mean the causal connection between the cost and the breach was severed. *See Franklin Federal Savings Bank v. United States*, 55 Fed.Cl. 108, 126 (finding in the reliance damages context that "plaintiffs are entitled to the costs they incurred raising replacement capital for all of the supervisory goodwill lost due to FIRREA, not the bare minimum needed to get [plaintiff] over the regulatory compliance threshold.").

Finally, defendant argues that Anchor should be denied costs incurred as a result of higher FDIC assessments because it is too speculative to determine what Anchor's actual assessments would have been but for the breach. Indeed, defendant goes so far as to hypothesize that, without the erasure of supervisory goodwill, Anchor would likely have faced even higher assessments than those for which it seeks recovery. Moreover, defendant continues, Anchor's claim for the assessments fails on foreseeability grounds because the government could never have foreseen at the time of contracting what Anchor's FDIC assessment costs might be.

These two arguments, again, cannot be decided on summary judgment. Inquiries dealing with foreseeability and speculativeness generally are, as stated repeatedly above, matters for trial and not summary judgment.

### V. Conclusion

For the reasons set forth above the court hereby orders the Clerk of the Court to enter the following: (1) defendant's motion for summary judgment on plaintiff's lost profits claim in connection with RFC, NAMCO, the 1993 stock offering, and the branch sales is hereby DENIED; (2) defendant's motion for summary judgment as to plaintiff's "gross-up" claim is hereby DENIED; (3) defendant's motion for summary judgment as to plaintiff's alternative claim based on a hypothetical preferred stock offering is hereby GRANTED; (4) defendant's motion for summary judgment on plaintiff's alternative claim for reliance damages is hereby GRANTED; and (5) defendant's motion for

summary judgment as to plaintiff's "wounded bank" damages is hereby DENIED.

### Exhibit 2
### Aggregate Balance Sheets for Anchor's Breached Supervisory Acquisitions
### Completed Between December 1982 and December 1985
### (Dollar Amounts in Thousands)

| | | Total Before Acquisition | Mark-to-Market Adjustments | Cash FSLIC Assistance | Total After Acquisition |
|---|---|---|---|---|---|
| 1 | Cash and Due From Banks | 41,136 | - | 62,875 | 104,011 |
| 2 | Investment Securities | 195,250 | 4,269 | | 189,519 |
| 3 | Mortgage-Backed Securities | 809,455 | (107,541) | | 701,914 |
| 4 | First Mortgage Loans | 1,719,082 | (287,181) | | 1,431,881 |
| 5 | Consumer and Other Loans | 75,277 | - | | 75,277 |
| 6 | Real Estate | 4,399 | (18) | | 4,382 |
| 7 | Accrued Interest Receivable | 26,770 | - | | 26,770 |
| 8 | FHLB Stock | 24,070 | - | | 24,070 |
| 9 | Premises and Equipment | 40,884 | (542) | | 40,342 |
| 10 | Goodwill | - | 684,204 | (62,875) | 601,329 |
| 11 | Servicing Rights Acquired | - | 84,000 | | 84,000 |
| 12 | Other Assets | 121,091 | (64,344) | | 56,737 |
| 13 | Total Assets | 3,057,364 | 292,847 | - | 3,350,231 |
| | | | | | |
| 14 | Deposits | 2,868,872 | 28,221 | | 2,897,093 |
| 15 | Borrowed Funds | 424,810 | (71) | | 424,739 |
| 16 | Mortgage Escrow Funds | 5,338 | - | | 5,338 |
| 17 | Accrued Expenses & Other | 25,866 | (2,805) | | 23,061 |
| 18 | Total Liabilities | 3,324,886 | 25,345 | - | 3,350,231 |
| | | | | | |
| 19 | Income Capital Certificate | - | 150,000 | - | 150,000 |
| 20 | Less FSLIC Note | - | (150,000) | - | (150,000) |
| | | | | | |
| 21 | Retained Income | (265,433) | 265,433 | - | - |
| 22 | Other | 989 | (989) | - | - |
| 23 | Equity Securities Valuation | (3,058) | 3,058 | - | - |
| 24 | Total Net Worth | (267,502) | 267,502 | - | - |
| | | | | | |
| 25 | Total Liabilities and Net Worth | 3,057,384 | 292,847 | - | 3,350,231 |

Notes/Line:

1 Cash assistance of $50.875 million for Suburban was counted as regulatory capital

19 The Income capital certificate of $150 million was counted as regulatory capital

Source: Audited Financial Statements

A. 52

166

## Exhibit SS-5
## Reliance Damages Summary
### (Dollar Amounts in Thousands)

### *Anchor's Investment*

| | | | |
|---|---|---|---|
| 1 | Cumulative Cash Loss From All Acquired Companies Thru 12/31/89 | $ | 255,437 |
| 2 | Less: 15% Adjustment for Non-Contractual Acquisitions | | (38,316) |
| 3 | Net Cash Losses from Contractual Acquisitions Through 12/31/89 | | 217,121 |

### *Adjustments*

| | | |
|---|---|---|
| 4 | Deficit from Contractual Acquisitions Before Purchase Accounting Adjustments | 193,584 |
| 5 | Reversion Value of the Deposit Base of Contractual Acquisitions as of 12/31/1989 | (55,602) |
| 6 | Value of Remaining Servicing as of 12/31/1989 | (37,500) |
| 7 | Total Adjustments | 100,482 |

### *Additional Expenses Incurred Due to the Breach*

| | | | |
|---|---|---|---|
| 8 | Wounded Bank Expenses | | 11,300 |
| 9 | **Total Reliance Damages (Lines 3 plus 7 plus 8)** | $ | 328,903 |

*Sources by Line Number:*
1 *Report of Barefoot Bankhead, March 16, 2000, and Exhibit SS-5*
2 *See Notes*
4 *See Notes*
5 *Exhibit SS-7*
6 *See Baxter Report, page 31, paragraph 89.*
8 *Supplement, Exhibit 12R*

A. 121

## Exhibit SS-5 - Notes
### (Dollar Amounts in Thousands)

Line No. on SS-5

2 The 15% allocation factor is based on two specific considerations;

(a) As of 12/31/1988, 12.9% of Anchor's total supervisory goodwill was accounted for by the four non-contractual acquisitions (Exhibit SS-1).

(b) As of 12/31/1988, the four non-contractual acquisitions represented 19.0% of the deposits acquired in all supervisory acquisitions, based on $3.109 billion of deposits shown in Exhibit SS-7, compared to $3.791 billion of deposits shown in Baxter Report Exhibit 26

4 The acquired deficits from contractual acquisitions are as follows:

| | | ($Thou) |
|---|---|---|
| (a) | Total Pre-Acquisition Negative Net Worth (Baxter Exhibit 2, line 24) | 267,502 |
| (b) | Cash FSLIC Assistance (Baxter Exhibit 2, line 1) | (62,875) |
| (c) | Tri-City and Heritage Accumulated Deficit (1984 audited financials, page F-10, AB00011225) | (8,013) |
| (d) | United Federal Accumulated Deficit (1984 audited financials, page F-11, AB00011226) | (548) |
| (e) | Acquired deficit of Standard Federal per accountants' letter of May 11, 1984 (AB00038148) | (3,582) |
| | Total Acquired Deficit from Contractual Acquisitions | 193,584 |

A. 122

168

## Exhibit SS-6
## Calculation of Cumulative Cash Loss From All Acquired Companies
## Through December 31, 1989
### (Dollar Amounts in Thousands)

| | | Jun-83 | Jun-84 | Jun-85 | Jun-86 | Jun-87 | Jun-88 | Jun-89 | Jun-90 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Pre-Tax Earnings | (19) | (3,662) | (32,554) | 11,077 | 51,202 | (31,779) | (50,537) | (169,456) | (225,728) |
| 2 | Cash Adjustments per Bankhead Exhibit H: | | | | | | | | | |
| 3 | Eliminate Discount Accretions | (2,057) | (25,978) | (23,505) | (19,603) | (16,377) | (11,979) | (10,366) | (14,055) | (123,920) |
| 4 | Eliminate Discount on Loan Sales | - | (60,191) | (97,344) | (26,003) | (33,105) | (30,438) | (9,468) | (58,058) | (284,608) |
| 5 | Eliminate Premium Amortization | (1,340) | (14,847) | (7,387) | (2,273) | (1,928) | (302) | (157) | (91) | (28,125) |
| 6 | Reverse Goodwill Amortization | 867 | 18,452 | 20,206 | 21,919 | 23,446 | 23,131 | 22,563 | 195,101 | 322,485 |
| 7 | Reverse Servicing Amortization | - | 8,706 | 8,100 | 7,796 | 8,891 | 6,202 | 36,079 | - | 73,774 |
| 8 | Reverse Write-offs of Servicing | - | 135 | 7,041 | 2,920 | 130 | - | - | - | 10,226 |
| 9 | Total Adjustments per Bankhead | (2,730) | (75,523) | (92,689) | (15,244) | (20,944) | (13,386) | 38,651 | 122,897 | (29,168) |
| 10 | Adjusted Pre-Tax Earnings per Bankhead | (2,749) | (79,185) | (95,443) | (4,167) | 30,258 | (45,165) | (11,886) | (46,559) | (254,896) |
| 11 | Additional Adjustments: | | | | | | | | | |
| 12 | Write-off of Servicing Rights Beyond 12/31/1989 | | | | | | | (23,821) | | (23,821) |
| 13 | Pro-Rate Fiscal 1990 Earnings by 50% | | | | | | | | 23,280 | 23,280 |
| 14 | Total Additional Adjustments | | | | | | | (23,821) | 23,280 | (542) |
| 15 | Total Cash Earnings (Loss) | (2,749) | (79,185) | (95,443) | (4,167) | 30,258 | (45,165) | (35,707) | (23,280) | (255,437) |

Sources:
1 Baxter Supplement Exhibit D, line 27, June 1983 through June 1989 and Bankhead Report Exhibit G-1 June 1983 through June 1990
3-10 Bankhead Report, Exhibit H
12 Bankhead Report Exhibit H, footnote 5, assumed all remaining servicing rights were written off as of June 30, 1989. The adjustment adds back the servicing balance as of December 31, 1989 in the amount stated in the Bankhead Report, paragraph 89.
13 Earnings for first half of fiscal 1990 are calculated by dividing entire year balance in line 10 by two.

A. 123